[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-10261

_____

Agency No. A089-217-930


JOSE ALBERTO PEREZ-GUERRERO,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(June 12, 2013)

Before PRYOR and JORDAN, Circuit Judges, and PRO,[*] District Judge.

PER CURIAM:

_____

[*] Honorable Philip M. Pro, United States District Judge for the District of Nevada, sitting by designation.

This petition presents the question whether the Board of Immigration Appeals erred when it denied Jose Alberto Perez-Guerrero's request for relief under the Convention Against Torture. Perez-Guerrero accepted a bribe from a Mexican drug cartel while he was employed by the United States Embassy in Mexico City. After the United States arrested Perez-Guerrero, he provided valuable information about corrupt officials in Mexico and pleaded guilty to bribery and obstruction of justice. Perez-Guerrero completed a sentence in a federal prison, and the United States then petitioned to remove him. The immigration judge and the Board concluded that Perez-Guerrero was subject to removal and that he was not entitled to relief under the Convention because he had failed to prove that it was more likely than not that he would be tortured in Mexico. We have jurisdiction to review only the conclusions of law, but not the findings of fact, of the Board. 8 U.S.C. § 1252(a)(2)(C), (D). Because the Board committed no error of law, we deny Perez-Guerrero's petition for relief under the Convention. We also reject Perez-Guerrero's argument that his removal to Mexico would violate his right to due process. And we direct the Clerk to seal records of Perez-Guerrero's guilty plea and those portions of the record that contain information about the identity and whereabouts of Perez-Guerrero's family.

## I.    BACKGROUND

Perez-Guerrero, a native and citizen of Mexico, accepted a bribe from a Mexican drug cartel while he worked for the United States Embassy in Mexico City.  Perez-Guerrero's job then was to assist the United States in locating and extraditing American fugitives in Mexico.  In November 2007, Perez-Guerrero and an associate named Jose Antonio Cueto Lopez accepted a bribe from a man known as "Mr. Nineteen."  In exchange for the bribe, Perez-Guerrero gave Mr. Nineteen information about an American fugitive who the Embassy was tracking in Mexico.

In June 2008, the United States flew Perez-Guerrero to Virginia under the pretense that he was to receive training in the United States, but federal officials arrested Perez-Guerrero upon his arrival at Dulles International Airport.  Perez-Guerrero admitted that he had accepted the bribe, and he cooperated with American and Mexican officials.  Over the next several months, Perez-Guerrero provided those officials with information about corrupt officials in Mexico who cooperated with the drug cartels.  Based in part on the information that Perez-Guerrero provided, officials conducted "Operation Cleanup," which led to the arrest of 45 people, including several high-ranking Mexican law enforcement officials.  Although officials promised Perez-Guerrero that his identity as an informant would remain confidential, Perez-Guerrero's identity as an informant was leaked to the media and published in news reports.

3

Perez-Guerrero pleaded guilty in the district court for the District of Columbia to one count of bribery, 18 U.S.C. § 201(b)(2)(C), and one count of obstruction of justice, id. § 1503. The district court sentenced Perez-Guerrero to 24 months of imprisonment. Perez-Guerrero agreed that he would be removed to Mexico after the completion of his sentence and that he would be in violation of the plea agreement if he contested his deportation on any grounds other than that he faced death or injury in Mexico as a result of the cooperation he provided to the United States and Mexican governments. Perez-Guerrero alleges that American officials told him that they would find a way to ensure that he did not return to Mexico at the conclusion of his prison sentence.

Near the end of his sentence, the Department of Homeland Security filed a notice for Perez-Guerrero to appear at a removal hearing. The Department stated that Perez-Guerrero was removable because he was an alien who had been convicted of a crime involving moral turpitude, 8 U.S.C. § 1182(a)(2)(A)(i)(I), and was an alien without a valid visa or entry document, id. § 1182(a)(7)(A)(i)(I). Guerrero conceded that he was removable, but he sought asylum, withholding of removal, and deferral of removal under the Convention Against Torture. Perez-Guerrero introduced evidence about country conditions and the likelihood that he would face torture in Mexico. This evidence included his own testimony, an

4

affidavit from his wife, the testimony of an expert on country conditions in Mexico, and documentary evidence.

Perez-Guerrero testified that he fears that he will be tortured or killed by the drug cartels and corrupt officials in Mexico. Perez-Guerrero testified that the information that he provided to police implicated several high-ranking Mexican officials and that police arrested most but not all of the individuals he implicated. Perez-Guerrero also stated in an affidavit that "law enforcement and other governmental institutions are often infiltrated by and effectively run by organized crime groups" and that he believes that "[i]t is reasonable to expect that the organized crime groups and/or the officials controlled by these organized crime groups in Mexico will kill me in an effort to seek revenge for the information I disclosed, which took down their colleagues." Perez-Guerrero testified that the witness protection program of Mexico would be unable to protect his identity from the cartels and corrupt officials. And he testified that, had he known that he would be sent back to Mexico after his arrest, he did not know if he would have assisted officials in their investigation because his safety and the safety of his family was "one of the main conditions" of his cooperation.

Perez-Guerrero also testified that his family has received threats in connection with his decision to cooperate with investigators. When Perez-Guerrero cooperated with American and Mexican officials, his wife worked at a

5

Mexican law enforcement agency.  Perez-Guerrero provided information to Mexican and American officials that led to the arrest of some of his wife's co-workers.  Perez-Guerrero testified, and his wife's affidavit confirmed, that his wife had received death threats and that some of her co-workers had told her that they could not associate with her because she was in danger and they did not want to be killed.  Perez-Guerrero also testified that his mother had received suspicious telephone calls in Mexico while he was in detention and that his wife had been forced to take their child out of school because she feared that he would be harmed.  Perez-Guerrero acknowledged that neither he nor his wife received any threats after he began serving his prison sentence in the United States.

Perez-Guerrero also introduced the testimony of Dr. Bruce Bagley, an expert on country conditions in Mexico, who testified that Perez-Guerrero faces danger in Mexico.  Dr. Bagley acknowledged that the then-president of Mexico, Felipe Calderón, had taken steps to combat corruption in the Mexican government, and that Calderón had attempted to reform the police forces at the national, state, and local levels.  Dr. Bagley testified that Calderón had reorganized the national police force and that Mexico might experience results from a better trained, better paid, and more highly monitored police force in approximately four years.  Dr. Bagley testified that Calderón had enjoyed less success in reforming state and local police forces, due in part to resistance from the Mexican Congress and the governors of

6

the Mexican states. But Dr. Bagley testified that, despite the reforms in Mexico, corrupt individuals continued to work for the Mexican government, and Perez-Guerrero faced grave danger in Mexico. Dr. Bagley testified that, if Perez-Guerrero returned to Mexico, "his life would be very short, [and] he would be killed as an example," and that Mexican officials would "[w]ithout a doubt" try to harm him. Dr. Bagley explained that corrupt officials sometimes torture or kill people on behalf of the cartels and that "there are cases where government officials have been participatory in torturing to get information out of individuals or actually pulling the trigger." He testified that there is nowhere in Mexico that Perez-Guerrero would be safe from the cartels and that the witness protection program of Mexico would be inadequate to protect Perez-Guerrero.

The immigration judge denied Perez-Guerrero's request for asylum, withholding of removal, and deferral of removal under the Convention Against Torture. The immigration judge issued a 46-page opinion that identified the documentary evidence that Perez-Guerrero submitted to the court and discussed in detail the testimony of Perez-Guerrero and Dr. Bagley. The immigration judge denied Perez-Guerrero's request for deferral of removal under the Convention because Perez-Guerrero failed to prove that more likely than not he would be harmed in Mexico or that Mexican officials would participate in any harm that he might suffer.

7

The immigration judge found that Perez-Guerrero failed to prove that it was more likely than not that he would endure severe pain or suffering in Mexico. The immigration judge acknowledged that Perez-Guerrero fears that he will be harmed in Mexico and that his wife received second-hand warnings while she was in Mexico. But the immigration judge stated that neither Perez-Guerrero nor his wife had received any direct threats and that his wife worked peacefully at her job with a Mexican law enforcement agency even though several of her co-workers had been implicated and arrested based on her husband's testimony.

The immigration judge also found that, even if Perez-Guerrero could prove that he will likely endure severe pain or suffering in Mexico, he failed to prove that any harm would occur with the consent or acquiescence of the Mexican government. The immigration judge acknowledged that corrupt officials work for the Mexican government, but it found that "the only officials who would presumably want revenge for [Perez-Guerrero's] whistleblowing activities, are those rogue government officials who he spoke out against as a condition of his plea agreement," and that most of those officials have been arrested as a result of Perez-Guerrero's testimony. The immigration judge also stated that Dr. Bagley's testimony and a country report by the State Department established that the Mexican government "has taken significant measures to combat the drug cartels operating in Mexico and their powerful influence over public officials." Perez-

8

Guerrero also argued before the immigration judge that his removal would violate a right to substantive due process, but the immigration judge did not address that argument.

Perez-Guerrero appealed the decision of the immigration judge to deny his application for withholding of removal and his request for deferral of removal under the Convention. Perez-Guerrero did not appeal the decision of the immigration judge to deny his request for asylum. The Board affirmed the decision of the immigration judge. And the Board declined to consider Perez-Guerrero's due process claim because it lacked the authority to do so.

The Board found that Perez-Guerrero failed to prove that he is likely to endure severe pain or suffering in Mexico. The Board acknowledged that some evidence, including the country report of the State Department, supports Perez-Guerrero's argument that torture occurs in Mexico and that Perez-Guerrero's family members had received threats in Mexico. And the Board stated that "[i]t is clear from the record that [Perez-Guerrero] will face danger in Mexico." But the Board found that Perez-Guerrero "has not received any direct threats and the record does not contain specifics, concerning the threats against the family." The Board found that, although Perez-Guerrero "will face some danger," he failed to prove that it was more likely than not that he would endure severe pain or suffering.

9

The Board also found that, even if Perez-Guerrero could prove that he will likely endure severe pain or suffering in Mexico, he failed to prove that any harm would occur with the consent or acquiescence of the Mexican government. The Board stated that Perez-Guerrero must prove that any harm he faces in Mexico will be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." See 8 C.F.R. § 1208.18(a)(1). The Board explained that the immigration judge had "found that, for the most part, those individuals in the government who would specifically target [Perez-Guerrero] are those who had been removed due to the information he provided." The Board adopted the finding of the immigration judge that both Dr. Bagley's testimony and the country report of the State Department establish that the Mexican government has undertaken substantial efforts to combat the cartels and eradicate corruption. The Board found that the record does not establish that it is more likely than not that Perez-Guerrero will face torture with the consent or acquiescence of the Mexican government.

Perez-Guerrero petitioned this Court for review of the denial of his request for relief under the Convention, but Perez-Guerrero did not challenge the decision of the Board to deny his application for withholding of removal. Before the parties filed their appellate briefs, the Attorney General filed a motion to dismiss Perez-Guerrero's appeal for lack of jurisdiction. The Attorney General argued that

10

Perez-Guerrero's appeal challenged only the factual determinations of the Board but that we lacked jurisdiction under the Real ID Act, 8 U.S.C. § 1252(a)(2)(C), to review those factual determinations.  In his reply to that motion to dismiss, Perez-Guerrero agreed that section 1252(a)(2)(C) limits our jurisdiction to a review of the legal determinations of the Board, but he argued that his petition for review contests only the legal conclusions of the Board.  We ordered that the motion to dismiss be carried with the case.

Perez-Guerrero also filed a motion to seal the entire record on appeal. Perez-Guerrero's motion to seal stated that Perez-Guerrero's underlying criminal case was sealed, that the hearing before the immigration judge occurred in a closed courtroom, and that the Board had agreed to hold the record "in confidence."  This Court, in a single-judge order, granted Perez-Guerrero's motion to seal the record "as to all matters other than the opinion by the merits panel" and carried with the case the motion to seal with regard to whether to seal our opinion.  After an oral argument open to the public, we directed the parties to file letter briefs to address which portions of the record before this Court should remain under seal.

## II.    STANDARD OF REVIEW

"We review the decision of the Board, and we review the decision of the Immigration Judge to the extent that the Board expressly adopted the opinion of the Immigration Judge."  Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1350

11

(11th Cir. 2009) (quoting <u>Mohammed v. U.S. Att'y Gen.</u>, 547 F.3d 1340, 1344 (11th Cir.2008) (internal citations omitted)).  "We review <u>de novo</u> the conclusions of law by the Board and Immigration Judge."  <u>Id.</u>

### III.    DISCUSSION

We divide our discussion in four parts.  First, we discuss why we have jurisdiction to review the legal conclusions, but not the factual findings, of the Board.  Second, we discuss why the Board committed no error of law when it denied Perez-Guerrero's application for relief under the Convention.  Third, we discuss why Perez-Guerrero's removal does not violate a right to due process of law.  Fourth, we discuss our decision to unseal most of the record.

### A.  The Real ID Act Limits Our Jurisdiction.

We have jurisdiction to review the legal conclusions, but not the factual findings, of the Board.  The Real ID Act of 2005 provides that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) [of Title 8]," 8 U.S.C. § 1252(a)(2)(C), except to the extent that the petition for review raises "constitutional claims or questions of law," <u>id.</u> § 1252(a)(2)(D).  One criminal offense covered in section 1182(a)(2) is the commission of a "crime involving moral turpitude."  <u>Id.</u> § 1182(a)(2)(A)(i)(I).  Perez-Guerrero concedes that he is removable by reason of having committed a crime involving moral

turpitude and that the jurisdictional bar of section 1252(a)(2)(C) applies to his petition. We lack jurisdiction to review the factual findings that Perez-Guerrero is unlikely to endure severe pain or suffering in Mexico and Mexican officials are unlikely to inflict, instigate, or consent to any pain or suffering that Perez-Guerrero might endure. See Singh v. U.S. Att'y Gen., 561 F.3d 1275, 1280–81 (11th Cir. 2009) (explaining that the determination that the petitioner failed to prove "that it was more likely than not that he would suffer torture upon return to Jamaica" is a finding of fact that courts lack jurisdiction to review when the jurisdictional bar of section 1252(a)(2)(C) is in effect). But we retain jurisdiction to review Perez-Guerrero's petition "in so far as he challenges the application of an undisputed fact pattern to a legal standard." Jean-Pierre v. U.S. Att'y Gen., 500 F.3d 1315, 1322 (11th Cir. 2007). For example, we have jurisdiction to review the legal questions "[w]hether a particular fact pattern amounts to [the legal definition of] 'torture,'" id., and whether the Board "failed to give reasoned consideration to [Perez-Guerrero's] claims," id. at 1326. We also have jurisdiction to review Perez-Guerrero's constitutional claim. 8 U.S.C. § 1252(a)(2)(D).

Before oral argument, Perez-Guerrero submitted a letter to this Court suggesting for the first time that the jurisdictional bar of section 1252(a)(2)(C) does not apply to his petition. Perez-Guerrero argued that his petition for deferral of removal under the Convention is not a "final order" within the meaning of

13

section 1252(a)(2)(C) because he is not removable "by reason of" his criminal conviction. But Perez-Guerrero had already conceded in his response to the motion to dismiss of the Attorney General that section 1252(a)(2)(C) applied to his petition, and he conceded that point again at oral argument. And we have already held that the finding of the Board that a petitioner seeking deferral of removal under the Convention failed to meet his burden of establishing that it was more likely than not that he would be tortured is an unreviewable fact finding under section 1252(a)(2)(C). See Cole v. U.S. Att'y Gen., 712 F.3d 517, 532–33 (11th Cir. 2013); Singh, 561 F.3d at 1280–81. "Under our prior precedent rule, a panel cannot overrule a prior one's holding even [if] convinced it is wrong." United States v. Steele, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc).

### B. The Board Committed No Error of Law When It Denied Perez-Guerrero's Application for Relief Under the Convention.

Perez-Guerrero argues that the Board committed an error of law when it denied his application for relief under the Convention, but this argument fails. The Board held that Perez-Guerrero failed to satisfy both parts of the test for whether an alien is entitled to relief under the Convention: the Board found that Perez-Guerrero is unlikely to endure severe pain or suffering in Mexico and that officials are unlikely to inflict, instigate, or consent to any pain or suffering that Perez-Guerrero might endure in Mexico. Perez-Guerrero argues that the Board failed to

14

give reasoned consideration to both parts of that test. We conclude that the Board gave reasoned consideration to Perez-Guerrero's argument that he was likely to endure severe pain or suffering in Mexico, and we dismiss Perez-Guerrero's petition on that ground. We need not reach Perez-Guerrero's argument that the Board failed to give reasoned consideration to whether Mexican officials might participate in his suffering.

An alien is entitled to relief under the Convention if the alien can prove "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The regulations that implement the Convention define "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Id. § 208.18(a)(1). The regulations also state that torture "is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman, or degrading treatment or punishment." Id. § 208.18(a)(2). The alien bears the burden to prove that it is more likely than not that he will be tortured in the country of removal. Id. § 208.16(c)(2). The alien must prove both that he is more likely than not to endure "severe pain or suffering" and that it is more likely than not that a "public official or other person acting in an official

15

capacity" will inflict, instigate, or acquiesce in his severe pain or suffering. See id. §§ 208.16(c)(2), 208.18(a)(1); Jean-Pierre, 500 F.3d at 1323.

The requirement that the Board give "reasoned consideration" to a petition derives from the regulation that, "[i]n assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered." 8 C.F.R. § 208.16(c)(3). The evidence that the immigration judge and the Board must consider includes "(i) Evidence of past torture inflicted upon the applicant; (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and (iv) Other relevant information regarding conditions in the country of removal." Id. To determine whether the Board gave reasoned consideration to a petition, we inquire only whether the Board "consider[ed] the issues raised and announce[d] [its] decision in terms sufficient to enable a reviewing court to perceive that [it] ha[s] heard and thought and not merely reacted." Cole, 712 F.3d at 534 (quoting Carrizo v. U.S. Att'y Gen., 652 F.3d 1326, 1332 (11th Cir. 2011) (internal quotation marks omitted)). Although the Board must consider all of the relevant evidence, the Board "need not address specifically each claim the petitioner made or each piece of evidence the petitioner presented." Id. (quoting Carrizo, 652 F.3d

16

at 1332 (internal quotation marks omitted)).  Our limited review of whether the Board gave reasoned consideration to a petition does not amount to a review for whether sufficient evidence supports the decision of the Board, and we lack jurisdiction to review petitions that "contest the weight and significance given [by the Board] to various pieces of evidence."  Id.

The Board gave reasoned consideration to the question whether Perez-Guerrero is likely to suffer severe pain or suffering in Mexico because the Board "consider[ed] the issues raised and announce[d] [its] decision in terms sufficient to enable a reviewing court to perceive that [it] ha[s] heard and thought and not merely reacted."  See id.  The Board applied the correct legal standard and explained that Perez-Guerrero must "establish that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal."  See 8 C.F.R. § 208.16(c)(2).  The Board considered all of the evidence relevant to Perez-Guerrero's argument that he would be tortured or killed in Mexico.  The Board acknowledged that the country report by the State Department supported Perez-Guerrero's argument that torture occurs in Mexico, that testimony established that Perez-Guerrero's family had received threats in Mexico, and that Dr. Bagley had testified that he believes Perez-Guerrero would be killed if he returned to Mexico.  But the Board also explained that Perez-Guerrero has not received any threats and that the record did not contain evidence of any specific threats that were directed at

17

his family.  The Board acknowledged Perez-Guerrero "will face some danger in Mexico," but it nonetheless "agree[d] with the Immigration Judge that [Perez-Guerrero] has not shown it is more likely than not that he would be tortured or killed."

Perez-Guerrero argues that the Board could not conclude both that he faces danger and that he is unlikely to suffer severe pain or death, but we disagree.  The Board reasonably found that Perez-Guerrero faces some danger, but that this risk of danger is not so great that he is likely to be tortured or killed.  That unreviewable factual determination did not amount to an error of law.

Perez-Guerrero argues that the record "contains ample evidence of widespread and growing human rights abuses" in Mexico and that the Board conducted "an incomplete examination of the record," but the decision of the Board makes clear that it considered all of the relevant evidence.  The Board mentioned that the country report suggests that torture occurs in Mexico, that Dr. Bagley testified that Perez-Guerrero would be killed in Mexico, and that the testimony evidence suggests that some of Perez-Guerrero's family members received threats.  But the Board found that, notwithstanding this evidence, Perez-Guerrero failed to prove that it is more likely than not that he would be tortured in Mexico.  To the extent that Perez-Guerrero contests the weight and significance

18

that the Board gave to the evidence, we lack jurisdiction to consider this argument. See Cole, 712 F.3d at 534; Singh, 561 F.3d at 1281.

Because the Board gave reasoned consideration to Perez-Guerrero's argument that he is likely to be tortured or killed, we need not address his alternative argument. That is, we need not consider Perez-Guerrero's argument that the Board failed to give reasoned consideration to his argument that Mexican officials would consent to or acquiesce in his torture.

C. *Perez-Guerrero's Removal Does Not Violate His Right to Due Process.*

Perez-Guerrero argues that, even if he is not entitled to relief under the Convention, the Due Process Clause of the Fifth Amendment prohibits his removal to Mexico. The Fifth Amendment provides in relevant part that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. Perez-Guerrero argues that, if the United States removes him to Mexico, the United States would fail to protect him from a danger that it created when it solicited his assistance as an informant against corrupt Mexican officials and failed to keep his identity confidential. Perez-Guerrero argues that he enjoys a substantive due process right to be free from a "state-created danger." Cf. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 201–02, 109 S. Ct. 998, 1006 (1989).

19

We reject Perez-Guerrero's argument.  We have explained that "only custodial relationships automatically give rise to a governmental duty, under substantive due process, to protect persons from harm by third parties."  Doe v. Braddy, 673 F.3d 1313, 1318 (11th Cir. 2012).  "[I]f the plaintiff alleging the rights violation is in no custodial relationship with the state, then state officials can violate the plaintiff's substantive due process rights only when the officials cause harm by engaging in conduct that is 'arbitrary, or consci[ence] shocking, in a constitutional sense.'"  Id. (quoting White v. Lemacks, 183 F.3d 1253, 1259 (11th Cir. 1999)).  We have explained that "even intentional wrongs seldom violate the Due Process Clause" and that "[w]e must take seriously the Supreme Court's caution against expanding the concept of substantive due process."  Waddell v. Hendry Cnty. Sheriff's Office, 329 F.3d 1300, 1304–05 (11th Cir. 2003).

We need not decide whether removable aliens have substantive due process rights in relation to being removed from the country because, assuming without deciding that removable aliens have such rights and the state-created danger doctrine applies in the context of removal proceedings, Perez-Guerrero has failed to establish that the conduct of the United States shocks the conscience.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845–46, 118 S. Ct. 1708, 1716–17 (1998); Waddell, 329 F.3d at 1305–06.

20

Perez-Guerrero has presented no evidence that the federal officials who made promises to Perez-Guerrero regarding the confidentiality of his identity and not returning him to Mexico knew those promises would not be kept at the time they made them.  See Waddell, 329 F.3d at 1305 (stating the governmental actor's conduct must be conscience-shocking "at the time the government actor made the decision" (emphasis omitted)).  Nor has Perez-Guerrero established that the United States revealed his identity to the press.  Consequently, we cannot say the agents' decision to make those promises to Perez-Guerrero shocks the conscience.

As to the decision to remove Perez-Guerrero after those promises went unfulfilled, by the time the United States sought to remove Perez-Guerrero, he had entered a plea agreement in the criminal case for which he received consideration on his sentence.  Based on the plea agreement, he not only was aware that the United States would seek to remove him, but he agreed to a stipulated order of removal.  The plea agreement provided that Perez-Guerrero could pursue various avenues of relief from removal based on "a well-founded fear that [removal to Mexico] will create a substantial risk of death or serious bodily injury to [Perez-Guerrero] on account of [his] cooperation with law enforcement officials."

When the United States sought to remove Perez-Guerrero, federal officials had agreed Perez-Guerrero could pursue those forms of relief set out by Congress and, in accordance with due process, based on a substantial risk to Perez-

21

Guerrero's safety.  But the Board found Perez-Guerrero did not meet his burden of showing it was more likely than not that he would be tortured upon return to Mexico.  In this circumstance, it cannot be said that federal officials acted with deliberate indifference to an extremely great risk of serious injury to Perez-Guerrero by returning him to Mexico.  See id. at 1306 (stating that, in a non-custodial situation, the governmental official must act "at the very least" with "deliberate indifference to an extremely great risk of serious injury").  Accordingly, Perez-Guerrero's removal does not violate a right to substantive due process.

### D. Only Portions of the Record Must Remain Sealed.

Perez-Guerrero had initially requested that we seal the entire record in this matter, and before oral argument, this Court granted that motion in a single-judge order.  After oral argument, we requested that the parties submit letter briefs to identify which portions of the record should remain under seal.  Perez-Guerrero now asks that our opinion conceal his identity and that of his family and counsel, and that we seal, at a minimum, the records of his guilty plea, his I-589 application for asylum and for withholding of removal, and the affidavits that he and his wife submitted to the immigration judge.

We vacate the order that sealed the entire record, and we direct the Clerk to seal only portions of the record.  We decline to conceal Perez-Guerrero's identity

because his name has unfortunately already been released in news articles, and we decline to conceal the identity of his counsel.  We have not mentioned the name of his wife or child in this opinion.  And we direct the Clerk to seal the records of Perez-Guerrero's guilty plea and those portions of the record that contain confidential information about Perez-Guerrero's family.

We have discretion to determine which portions of the record should be placed under seal, but our discretion is guided by the presumption of public access to judicial documents.  "What transpires in the court room is public property," Craig v. Harney, 331 U.S. 367, 374, 67 S. Ct. 1249, 1254 (1947), and both judicial proceedings and judicial records are presumptively available to the public, Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1311 (11th Cir. 2001).  As Judge Easterbrook has explained, "Judges deliberate in private but issue public decisions after public arguments based on public records. . . . Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat and requires rigorous justification."  Hicklin Eng'g, L.C. v. Bartell, 439 F.3d 346, 348 (7th Cir. 2006).

The right of the public to access judicial records is grounded in the common-law right of access.  The Supreme Court has explained that there exists "a general right to inspect and copy public records and documents, including judicial records and documents," but that this common-law "right to inspect and copy judicial

23

records is not absolute." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597, 598, 98 S. Ct. 1306, 1312 (1978) (internal footnote omitted).  Courts have discretion to determine which portions of the record, if any, should remain under seal, and this discretion is "to be exercised in light of the relevant facts and circumstances of the particular case."  Id. at 599, 98 S. Ct. at 1312–13.

To determine the scope of the common-law right of access, which applies in both criminal and civil proceedings, we "traditionally distinguish between those items which may properly be considered public or judicial records and those that may not; the media and public presumptively have access to the former, but not to the latter."  Chicago Tribune, 263 F.3d at 1311.  We have explained that, at least in the context of civil proceedings, the decision to seal the entire record of the case— including the pleadings, docket entries, orders, affidavits, and hearing transcripts— must be "necessitated by a compelling governmental interest [ ] and [be] narrowly tailored to that interest."  Id. (quoting Wilson v. Am. Motors Corp., 759 F.2d 1568, 1571 (11th Cir. 1985)).  When a party seeks to seal only particular documents within the record, our task is only "to balance the competing interests of the parties."  Id. at 1312.  "Our case law lists several relevant factors to consider, including 'whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, [and] whether access is likely to promote public understanding of historically significant events.'"

24

F.T.C. v. AbbVie Prods. LLC, 713 F.3d 54, 62 (11th Cir. 2013) (quoting Newman

v. Graddick, 696 F.2d 796, 803 (11th Cir. 1983)).  The contours of this common-

law right have been explored primarily in the context of criminal and civil matters,

but these principles, coupled with the presumption that judicial records should be

available to the public, govern our decision in this immigration case too.

We decline to conceal the identity of Perez-Guerrero or his counsel.  The

Board made a finding of fact that Perez-Guerrero will face some danger in Mexico,

and we have stated in this opinion only the facts necessary to our decision and have

declined to provide the names of Perez-Guerrero's family members.  But a

decision to omit Perez-Guerrero's name from this opinion would do little to protect

his safety.  Perez-Guerrero concedes that his name, photograph, and identity as an

informant have been widely reported in the media.  The underlying facts of Perez-

Guerrero's arrest have been reported too, along with the results of Operation

Cleanup.  A decision to omit Perez-Guerrero's name from this opinion would also

have little practical effect because his name appears throughout the record,

including in the briefs, and because his name and the facts of this case were

discussed at an oral argument open to the public.  Perez-Guerrero has also not

made any showing that his lawyers face retaliation for defending him, and their

identities are also revealed in documents throughout the record.

25

We grant Perez-Guerrero's request to seal the records of his guilty plea before the district court for the District of Columbia. That court placed the records of Perez-Guerrero's plea under seal and granted Perez-Guerrero's request to unseal portions of that record on the condition that they be used for Perez-Guerrero's immigration proceedings only and be resealed upon completion of those proceedings. We decline to vitiate that ruling by unsealing those records.

We also grant Perez-Guerrero's request to seal his I-589 application, which contains sensitive information about his family members. We will also seal those portions of Perez-Guerrero's affidavit that mention his family and we seal the entire affidavit of his wife. Perez-Guerrero requests that we seal his entire affidavit, but that request is overbroad because most of the information in that affidavit does not contain sensitive information about Perez-Guerrero's family and contains information that is repeated elsewhere in the record, including in the comprehensive decision of the immigration judge.

We direct the Clerk to seal pages 16, 20, 22, 31–32, 192–196, 251–257, 279–281, 294, 299, 301–304, 444–686, 747–758, 761, 763, 766, 805–806, 813–815, 844–853, 1030–1044, 1085, 1411–1420, 1443–1452, 1503–1536, 1550, 1555, 1576, and 1616–1627 of the administrative record and to unseal the balance of the record. The appellate briefs before this Court should also be unsealed. This order

concerns only the record before this Court and does not affect the confidentiality with which the Board treats immigration records.  See 8 C.F.R. § 1208.6.

## IV.    CONCLUSION

We **DENY** the motion of the Attorney General to dismiss Perez-Guerrero's petition for lack of jurisdiction.  We **DENY** Perez-Guerrero's petition for review. We **VACATE** the single-judge order that granted Perez-Guerrero's motion to place the entire record under seal, and we **GRANT IN PART** and **DENY IN PART** Perez-Guerrero's motion to seal.  We instruct the Clerk to place under seal only those portions of the record identified in this opinion.

PRYOR, Circuit Judge, concurring in part and concurring in the judgment:

I concur in full as to all but Part III.C. of the majority opinion, and I concur in the result as to that part.  I write separately to explain that there is a sounder way to resolve Perez-Guerrero's claim that the United States violated his right to due process, U.S. Const. Amend. V.  The Court assumes without deciding that Perez-Guerrero has a right to substantive due process and then concludes that his removal does not "shock the conscience" of the Court.  Majority Op. at 20.  I would instead hold that an alien has no substantive right, under the Due Process Clause, to be free from an order of removal and that the doctrine of state-created danger has no application in immigration proceedings.  That approach respects both the separation of powers and the precedents of the Supreme Court.

An alien enjoys no substantive right of due process to be free from an order of removal.  The Constitution assigns to the political branches, not to the judiciary, the power to expel or retain aliens.  See U.S. Const. Art. I, § 8 (granting Congress the power to "provide for the common Defence," to "regulate Commerce with foreign Nations," and to "establish an uniform Rule of Naturalization"); id. Art. II § 3 (providing that the President "shall take Care that the Laws be faithfully executed").  The Supreme Court has described "the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."  Fiallo v. Bell, 430 U.S. 787,

28

792, 97 S. Ct. 1473, 1478 (1977) (quoting <u>Shaughnessy v. United States ex rel.</u> <u>Mezei</u>, 345 U.S. 206, 210, 73 S. Ct. 625, 628 (1953)).  Although "[i]n the enforcement of [immigration] policies, the Executive Branch of the Government must respect the procedural safeguards of due process[,] . . . that the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."  <u>Galvan v. Press</u>, 347 U.S. 522, 531, 74 S. Ct. 737, 743 (1954).

Perez-Guerrero is entitled to pursue those avenues for relief that Congress has afforded to him, but "we have no judicial authority to substitute our political judgment for that of the Congress" and augment those statutory avenues for relief with one of judicial creation.  See <u>Fiallo</u>, 430 U.S. at 798, 97 S. Ct. at 1481. Several of our sister circuits agree that the Due Process Clause does not prohibit the removal of aliens from the United States and that the doctrine of state-created danger has no application in immigration proceedings.  See <u>Vicente-Elias v.</u> <u>Mukasey</u>, 532 F.3d 1086, 1095 (10th Cir. 2008); <u>Enwonwu v. Gonzales</u>, 438 F.3d 22, 30–31 (1st Cir. 2006); <u>Kamara v. Att'y Gen. of the U.S.</u>, 420 F.3d 202, 217–18 (3d Cir. 2005).

The Court assumes without deciding that the state created danger doctrine applies in the immigration context, but I see no reason to make an assumption unsupported by the text of the Constitution or the decisions of the Supreme Court.

29

The Court cites no authority to support the existence of a right to substantive due process in this context.  As the Supreme Court has "decline[d] to fashion a new due process right out of thin air," Carlisle v. United States, 517 U.S. 416, 429, 116 S. Ct. 1460, 1468 (1996), so too should we decline to assume the existence of a new due process right out of thin air.  See Waddell v. Hendry Cnty. Sheriff's Office, 329 F.3d 1300, 1304–05 (11th Cir. 2003) (explaining that we must "take seriously the Supreme Court's caution against expanding the concept of substantive due process").

Nor does the doctrine of constitutional avoidance or the principle of judicial restraint support assuming the existence of Perez-Guerrero's claim.  The Court substitutes one constitutional question—whether a substantive due process right exists—with another constitutional question—whether the removal of Perez-Guerrero "shocks the conscience."  And the Court opines about the constitutionality of Executive action when the Constitution and Supreme Court precedent establish that we lack the authority to do so.  The Court eschews a decision based on text and precedent for a decision based on the "oxymoron" of substantive due process, United States v. Carlton, 512 U.S. 26, 39, 114 S. Ct. 2018, 2026 (1994) (Scalia, J., concurring in the judgment), where "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended" and "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care

30

whenever we are asked to break new ground in this field," see Collins v. City of Harker Heights, Tex., 503 U.S. 115, 125, 112 S. Ct. 1061, 1068 (1992); see also Nix v. Franklin Cnty. Sch. Dist., 311 F.3d 1373, 1375 (11th Cir. 2002) (explaining that the "somewhat nebulous" "shock the conscience" test has "taken on different meanings in different cases"). I would hold that an alien has no substantive right, under the Due Process Clause, to be free from an order of removal.