[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15437
Non-Argument Calendar
_____

Agency No. A206-703-913

MARIBEL MEJIA JERONIMO,
HENSLEY YERAIDY CARRILLO MEJIA,
DANDERLY MADENNY CARRILLO MEJIA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(January 30, 2017)

Before HULL, WILSON and FAY, Circuit Judges.

PER CURIAM:

Maribel Mejia Jeronimo and her two daughters, Hensley Yeraidy Carrillo Mejia and Danderly Madenny Carrio Mejia, petition for review of the Board of Immigration Appeals ("BIA") order affirming the denial by the Immigration Judge ("IJ") of their application for asylum and withholding of removal. We deny their petition.

## I. BACKGROUND

Jeronimo, a native and citizen of Guatemala, entered the United States with her two daughters in July 2014. She immediately was detained by border patrol agents and later submitted to a credible-fear interview with an asylum officer. When asked if she ever had been harmed or threatened in Guatemala, Jeronimo responded Gaspar Carrillo Diego, the father of her children and the man with whom she had lived, first had harmed her two to three years prior when he came home drunk, grabbed her by the neck, and said he was going to kill her. When she tried to run away from him, he hit her head with a bottle; she still has a scar from this incident. He continued to harm her by kicking and slapping her, but the first incident was the most severe. Jeronimo also claimed she had been mistreated by Diego's family, because of her religion; she is part of the evangelical church and his family is Catholic. When asked if she had been harmed or threatened in Guatemala because of her race, color, or family heritage, Jeronimo responded she had been harassed and insulted by other students when she was younger, because

2

she spoke Mam and because of her ethnic origin.  Jeronimo feared her husband

would harm or kill her if she returned to Guatemala.  The asylum officer found she

had established a credible fear of persecution.

On August 1, 2014, Jeronimo was issued a Notice to Appear ("NOA") by

the Department of Homeland Security ("DHS") stating she was an alien present in

the United States, who had not been admitted or paroled and was subject to

removal pursuant to the Immigration and Nationality Act ("INA") §

212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I).  Jeronimo appeared before an IJ

and admitted the factual allegations in the NOA but denied she was removable.

DHS then filed additional charges of inadmissibility as to Jeronimo and her two

children and alleged they were aliens present in the United States without being

admitted or paroled in violation of INA § 212(a)(6)(A)(i), 8 U.S.C. §

1182(a)(6)(A)(i).  Jeronimo conceded removability at a later hearing.

Jeronimo filed an application for asylum, withholding of removal, and relief

pursuant to the United Nations Convention Against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment ("CAT") in December 2014; she

listed her daughters as derivative beneficiaries.  In her application, Jeronimo stated

she was seeking asylum based on domestic abuse, because she had been regularly

slapped, kicked, and called bad words by Diego.  She recounted the incident

described to the asylum officer.

Jeronimo also submitted a memorandum of law in support of her claim for asylum and withholding of removal; she argued the repeated acts of violence perpetrated against her by Diego, in combination with the persecution she suffered because of her ethnicity and religion, established past persecution because of a protected ground. Jeronimo claimed persecution because of her membership in the particular social group of "[i]ndigenous Guatemalan women perceived as the property of and suffering domestic violence at the hands of their intimate partners, and who are unable to safely leave the relationship." Appl. for Relief & Mem. at 10 (Dec. 2, 2014). She argued she had established a well-founded fear of future persecution by Diego and her community if she were to return to Guatemala. She attached a personal declaration in support of the memorandum and several exhibits showing members of her particular social group were routinely subject to persecution in Guatemala.

DHS also submitted additional exhibits, including the transcript of Jeronimo's credible-fear interview, two articles concerning Guatemala's first-ever female vice president, and the Guatemala 2013 International Religious Freedom Report from the United States Department of State. This report showed the Guatemalan laws protect religious freedom but the constitution recognizes the distinct legal personality of the Catholic Church and requires religious groups other than the Catholic Church to register as legal entities to conduct business. It also

4

noted there were reports of "societal abuses or discrimination based on religious affiliation, belief, or practice."  DHS Submission of Docs. Ex. B at 1.

At the merits hearing, all documents attached to Jeronimo's memorandum of law were admitted.  Jeronimo objected to the admission of the DHS exhibits and claimed she had not had the opportunity to review some of them, particularly one of the articles.  DHS argued everything in the articles was substantiated by the Country Report submitted by Jeronimo and only served to establish there was a female vice president in Guatemala.  The IJ noted the articles contained helpful background information and no one would be prejudiced by the admission of the evidence.

At the hearing, Jeronimo testified she was born in Guatemala in 1993; she belongs to a Guatemalan indigenous tribe and speaks the Mam language.  She is a member of the Evangelical Church.  When she was 18 years old, she began living with Diego after she became pregnant by him.  They lived in Barillas, Guatemala, with Diego's parents.  Barillas is approximately four to five hours from Jeronimo's native hometown of Flor del Norte.  Diego and his parents are Roman Catholic.  Her refusal to be baptized into the Catholic Church created tension among her, Diego, and his parents.  After about three years of cohabitation, Diego began abusing Jeronimo.  In one incident, Diego, apparently upset Jeronimo had borne two daughters and no sons, grabbed her by the neck and hit her with a bottle.  She

took her two children and returned to Flor del Norte to live with her parents. Jeronimo remained with her parents for fifteen days until Diego came to visit her. He promised to change his ways and asked her to return to Barillas, which she did. Jeronimo did not report this incident to the police, because the police do not investigate domestic violence.

In a second incident, sometime in December 2013, Diego bit Jeronimo's cheek, held a knife to her neck, and threatened to kill her. She also did not report this incident to the police. Jeronimo returned to Flor del Norte and stayed there for about seven months, until she came to the United States in July 2014. She testified the relationship was over, and she had no intention of returning to Diego.

About a month after Jeronimo left for the United States, Diego returned to Flor del Norte and threatened to kill her if she was with another man or if she began to work again. He made this threat to a friend in the street close to Jeronimo's parents' home. Jeronimo testified she cannot remain with her parents, because her mother suffers from diabetes, although two of her seven siblings live with her parents. She believes living with her mother would "alter her. . . . degree of diabetes." Hr'g Tr. at 74-75 (Jan. 7, 2015).

The IJ found Jeronimo's testimony credible, despite inconsistences between her hearing testimony and her prior statements; however, she had failed to show past persecution because of a protected ground. First, the IJ found she had not

6

shown the harm she suffered was inflicted by the government or by a private actor the government was unable or unwilling to control; she had made no attempt to report her abuse to police. Although there were still problems in Guatemala, attitudes were slowly changing and had changed sufficiently. The IJ also noted Jeronimo had not shown Diego had "the ability to harm her throughout the country of Guatemala," because she was able to stay safely with her parents and had not shown she could not move to another area of Guatemala to avoid harm. Oral Decision of the IJ at 9 (Jan. 7, 2015). Second, the IJ concluded Jeronimo had not shown she suffered harm because of a protected ground. She had failed to show an objective basis for her fear of future persecution if she should return to Guatemala. The IJ also denied Jeronimo's petition for withholding of removal and for CAT relief. Because she was not eligible for asylum, the IJ concluded it necessarily followed she could not meet the higher burden for establishing eligibility for withholding of removal. There was no evidence the Guatemalan government would harm or torture her in any way or would be willfully blind to torture by a third party.

Jeronimo appealed to the BIA. The BIA found Jeronimo had failed meaningfully to contest the IJ's denial of her application for protection under the CAT; consequently, that issue was waived on appeal. The BIA acknowledged Jeronimo's argument DHS had conceded she had suffered harm rising to the level

7

of past persecution but noted the IJ never reached that issue.  The BIA also noted

the DHS comments on the record did not constitute a "formal concession of a legal

issue."  Decision of BIA at 2 n.2 (Nov. 9, 2015). The BIA agreed with the IJ

Jeronimo had failed to show a nexus between the harm she suffered and the

particular social group with which she identified.  The BIA acknowledged in

*Matter of A-R-C-G-*, 26 I. & N. Dec. 388, 389 (BIA 2014), it had recognized,

depending on the facts in a particular case, "married women in Guatemala who are

unable to leave their relationship" could constitute a particular social group for

asylum and withholding of removal.  In that case, however, DHS had conceded the

petitioner had suffered past persecution because of membership in a particular

social group; where a concession is not made, the issues of whether there was past

persecution and whether it was because of a protected ground would be decided

based on the particular facts and evidence.  Even assuming Jeronimo could

demonstrate the social group identified was a cognizable social group under the

INA, the BIA found she had not established she was a member of that group, since

she twice safely had left her relationship with her abusive partner.

The BIA also concluded Jeronimo had not established the Guatemalan

government or police were unable or unwilling to protect her; while Jeronimo's

credible testimony established a subjective fear of persecution, her fear was not

objectively reasonable.  Therefore, Jeronimo had not met her burden of

8

establishing asylum, and she could not meet the more stringent burden to establish withholding of removal.  Jeronimo had not raised her humanitarian asylum argument before the IJ, so it was waived on appeal.  Even if the issue had been properly before the IJ, Jeronimo had failed to establish she would be entitled to humanitarian asylum, because the past harm she described did not rise to the requisite level of severity, and she had failed to establish a reasonable possibility she would suffer other serious harm.

The BIA examined Jeronimo's due-process claim and determined the IJ had not acted in an arbitrary and capricious manner during her hearing.  The BIA found no evidence of bias or undue hostility by the IJ or any resulting prejudice to Jeronimo.  The BIA noted the IJ has broad discretion to accept evidence and assess its evidentiary value and had rejected Jeronimo's contention the IJ improperly admitted evidence over her objection and failed adequately to weigh and consider that evidence.  Regarding her assertion the IJ erred by not requiring DHS to rebut her well-founded fear of persecution, the BIA noted, because she had failed to show past persecution because of a protected ground, the burden never shifted to DHS to show changed country conditions.  The BIA also addressed Jeronimo's due process argument of an allegedly inferior translation and found she had neither identified any specific mistranslation nor provided any evidence her testimony was

9

mistranslated or misunderstood by the IJ.  Consequently, the BIA dismissed Jeronimo's appeal.

## II. DISCUSSION

### A. Claim for Asylum or Withholding of Removal

On petition for review, Jeronimo first argues the IJ and BIA erroneously concluded (1) she was not a member of the particular social group she identified in her application; (2) she did not have an objectively reasonable, well-founded fear of future persecution; (3) country conditions in Guatemala had changed; (4) she had failed to show she could not relocate to another area of Guatemala; (5) it would not have been futile for her to report her abuser to law enforcement; and (6) she had not demonstrated she was entitled to withholding of removal.  Because the government conceded she had suffered past persecution, Jeronimo also argues she was entitled to the presumption of a well-founded fear of future persecution, which the government failed to rebut.

We review only the decision of the BIA, except to the extent the BIA expressly adopts the IJ's decision.  *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001).  Where the BIA agrees with the IJ's reasoning, we also will review the IJ's decision to that extent.  *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010).  In this case, the BIA did not expressly adopt the IJ's decision but agreed with the IJ's findings on nexus and on whether the Guatemalan government

was unwilling or unable to protect Jeronimo.  Therefore, we will review both decisions to that extent.  *See Al Najjar*, 257 F.3d at 1284.

We review legal determinations by the BIA de novo. *Zhu v. U.S. Att'y Gen.*, 703 F.3d 1303, 1307 (11th Cir. 2013).  Factual determinations are reviewed under the substantial-evidence test, which requires us to view the record in the light most favorable to the agency's decision and draw all reasonable inferences in its favor. *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc).  We will affirm the decision of the BIA if, considering the record as a whole, it is supported by reasonable, substantial, and probative evidence.  *Id.* at 1027.  In order to reverse administrative factual findings, we must determine that the record "compels" reversal, not merely that it supports a different conclusion.  *Id.*  We have found BIA errors to be harmless, where the BIA also rested its ruling on an alternative determination that was not erroneous.  *Guzman-Munoz v. U.S. Att'y Gen.*, 733 F.3d 1311, 1314 (11th Cir. 2013).

An applicant for asylum must meet the INA definition of a refugee.  INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).  The INA defines a refugee as a person "who is unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of" her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  INA § 101(a)(42)(A), 8 U.S.C.

§ 1101(a)(42)(A).  To establish eligibility for asylum, a petitioner must demonstrate either past persecution, or a well-founded fear of future persecution, based on a statutorily listed factor.  *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006).  Once a petitioner demonstrates past persecution, the burden shifts to the government to show by a preponderance of the evidence (1) there has been a fundamental change in country conditions such that the applicant no longer has a well-founded fear of persecution because of a protected ground, or (2) the applicant reasonably could avoid future persecution by relocating to another part of the applicant's country.  8 C.F.R. § 208.13(b)(1)(i)(A)-(B); *see also Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1351-52 (11th Cir. 2009).

Congress has not defined what constitutes a "particular social group" under the INA but, in *Castillo-Arias v. U.S. Attorney General*, 446 F.3d 1190 (11th Cir. 2006), we approved the BIA's definition of the term as a group of persons who share a common characteristic that is immutable or fundamental to its members' individual identities or consciences.  *Id.* at 1196-97.  The BIA has concluded, depending on the facts and evidence in a particular case, "married women in Guatemala who are unable to leave their relationship" can constitute a cognizable, particular social group that forms the basis for asylum or withholding of removal.  *Matter of A-R-C-G-*, 26 I. & N. Dec. at 389.  In that case, the BIA also noted DHS had conceded the petitioner had suffered past persecution, and the persecution was

12

because of her membership in a particular social group. *Id.* at 395. Where concessions are not made, the BIA stated "these issues will be decided based on the particular facts and evidence on a case-by-case basis as addressed by the Immigration Judge in the first instance." *Id.*

Even assuming the government conceded the harm Jeronimo had suffered rose to the level of persecution, it clearly did not concede the persecution was because of a protected ground. The BIA was correct in noting any concession made by DHS was "not determinative of the legal issues in this case." Decision of BIA at 2 n.2. Regarding the finding Jeronimo was not eligible for asylum, substantial evidence supports the conclusion Jeronimo did not suffer past persecution "on account of" a protected ground, because she did not belong to the particular social group she identified: indigenous women who live with a domestic partner and who suffer abuse and cannot leave safely from that domestic partner relationship. The evidence shows Jeronimo was able to leave safely her domestic relationship on at least two occasions; therefore, it cannot be said the record compels the conclusion she had suffered past persecution because of a protected ground. *Adefemi*, 386 F.3d at 1026-27. The determination that the protected ground Jeronimo identified did not apply to her was also fatal to her ability to demonstrate a well-founded fear of future persecution because of a protected ground. *Ruiz*, 440 F.3d at 1257. Significantly, Jeronimo had failed to report the

13

abuse to the police; failure to report persecution to local government authorities generally is fatal to an asylum claim. *Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1345 (11th Cir. 2007) (citing *In re S-A-*, 22 I. & N. Dec. 1328, 1335 (BIA 2000)) (noting, however, a failure to report would be excused, where the petitioner shows those authorities would have been unable or unwilling to protect her).

Substantial evidence also supports the conclusion Jeronimo did not establish she was entitled to withholding of removal. The standard for withholding of removal is more stringent than for asylum. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232-33 (11th Cir. 2005) (recognizing if an applicant is unable to prove entitlement to asylum relief, she generally is precluded from qualifying for withholding of removal). Because Jeronimo could not show her entitlement to asylum relief, she similarly failed to demonstrate it was "more likely than not" that she would be persecuted because of a protected ground upon returning to Guatemala. *Id.* at 1232 (citation and internal quotation marks omitted).

## B. Claim for Humanitarian Asylum

Jeronimo also argues the BIA erred in concluding she had not exhausted her claim for humanitarian asylum before the IJ, and she was not eligible for humanitarian asylum, because she had not suffered sufficiently severe harm. We review de novo legal conclusions, including questions of subject-matter jurisdiction. *Kazemzadeh*, 577 F.3d at 1350; *Amaya-Artunduaga v. U.S. Att'y*

*Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006).  We lack jurisdiction to consider a claim raised in a petition for review, unless the petitioner first has exhausted her administrative remedies.  *Amaya-Artunduaga*, 463 F.3d at 1250.  The exhaustion doctrine requires the petitioner to raise claims before the agency to ensure the agency had a full opportunity to consider the claims.

An applicant may qualify for asylum even in the absence of showing a well-founded fear of future persecution if (1) "[t]he applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution," or (2) "[t]he applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country."  8 C.F.R. § 1208.13(b)(1)(iii).  This provision describes what courts refer to as "humanitarian asylum."  *Mehmeti v. U.S. Att'y Gen.*, 572 F.3d 1196, 1200 (11th Cir. 2009) (citation and internal quotation marks omitted).  As we noted in *Mehmeti*, other circuits reviewing applications for humanitarian asylum have concluded this relief is reserved for the most extraordinary cases.  *Id.* at 1200-01 (citing *Gonahasa v. U.S. INS*, 181 F.3d 538, 544 (4th Cir. 1999)  ("Eligibility for asylum based on severity of persecution alone is reserved for the most atrocious abuse."); *Bucur v. INS*, 109 F.3d 399, 405 (7th Cir. 1997) (characterizing humanitarian asylum as being reserved for situations such as the German Jews, the victims of the Chinese "Cultural Revolution," and

15

survivors of the Cambodian genocide (citation and internal quotation marks omitted)); *Krastev v. INS*, 292 F.3d 1268, 1280 (10th Cir. 2002) (explaining past persecution must have been so severe it would "so sear a person with distressing associations with his native country that it would be inhumane to force him to return there, even though he is in no danger of future persecution") (citation and internal quotation marks omitted)).

The BIA has interpreted this form of relief to require an applicant to show "severe harm" and "long-lasting effects." *Id.* (citation and internal quotation marks omitted). The BIA must give "reasoned consideration" to a petition for relief from removal. *Perez-Guerrero v. U.S. Att'y Gen.*, 717 F.3d 1224, 1232 (11th Cir. 2013). In doing so, the BIA must consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive it had "heard and thought and not merely reacted." *Id.* (citation and internal quotation marks omitted).

Presuming Jeronimo's claim for humanitarian asylum was properly exhausted before the BIA, substantial evidence supports the BIA conclusion the harm Jeronimo described does not rise to the level of severity required to establish eligibility for humanitarian asylum. The record does not compel the conclusion Jeronimo suffered such "severe harm" or "atrocious abuse" in Guatemala that it would be "inhumane to force [her] to return there." *Mehmeti*, 572 F.3d at 1200

16

(citations and internal quotation marks omitted).  The BIA decision concerning Jeronimo's eligibility for humanitarian asylum should be viewed in the context of the entire BIA decision, which fully discusses the harm Jeronimo suffered.  The record shows the BIA considered the evidence and concluded the harm was not sufficiently severe to warrant humanitarian asylum.  Therefore, the BIA satisfied the reasoned-consideration standard.  *Perez-Guerrero*, 717 F.3d at 1232.

## C. Due Process Claims

Jeronimo additionally argues the BIA erred in concluding the IJ had not deprived her of her constitutional right to due process by (1) admitting evidence over her counsel's objection, (2) creating a hostile environment, (3) failing to consider all of the evidence of record, (4) giving too much weight to certain pieces of evidence taken out of context and in isolation, and (5) failing to require DHS to prove, by a preponderance of the evidence, conditions in Guatemala had changed and Jeronimo no longer had a well-founded fear of future harm if she were to return.  We review constitutional challenges regarding removal proceedings de novo. *Alhuay v. U.S. Att'y Gen.*, 661 F.3d 534, 548 (11th Cir. 2011).  Aliens are entitled to due process in removal proceedings. *Id.*  Due process requires aliens receive a full and fair hearing. *Id.*  To establish a due process violation, the alien "must show that she was deprived of liberty without due process of law and that the purported errors caused her substantial prejudice." *Id.* (citation and internal

17

quotation marks omitted).  To show substantial prejudice, the alien must establish the outcome of the proceeding would have been different but for the alleged errors. *Id.*

The IJ has broad discretion to accept evidence into the record and to weigh its evidentiary value.  8 C.F.R. § 1003.10(b).  While we have not defined in a published opinion when an IJ has acted in a manner depriving an alien of her due process rights, the Seventh Circuit has held the IJ does not violate the applicant's due process rights by limiting some testimony or frequently interrupting the applicant's presentation when it does so merely to focus the proceedings and exclude irrelevant evidence.  *Kerciku v. INS*, 314 F.3d 913, 917-18 (7th Cir. 2003). The IJ does, however, violate an applicant's right to due process where he "bar[s] complete chunks of oral testimony that would support the applicant's claims."  *Id.* at 918.  The Ninth Circuit similarly has held an applicant is denied a full and fair hearing in violation of the Fifth Amendment where the IJ acts, not as a neutral fact-finder, but as a partisan adjudicator seeking to intimidate the petitioner and her counsel and "refuse[s] to let [petitioner] testify about anything that was included in his written application."  *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000).

Jeronimo has not shown the IJ erred in admitting evidence over her objection or she was prejudiced by the admission of evidence, because none of the evidence DHS submitted at the merits hearing was referenced in the IJ's oral

18

decision.  Jeronimo also has not shown the IJ's actions at the merits hearing were so egregious as to deprive her of a full and fair hearing.  *See Kerciku*, 314 F.3d at 917-18; *Colmenar*, 210 F.3d at 971.  Jeronimo has failed to meet her burden of showing "substantial prejudice."  She also failed to cite any evidence or argument she was unable to present; nor does she show how the outcome of her case would have been different had the immigration judge conducted her hearing differently.  The IJ did not erroneously fail to shift the burden to DHS to show changed country conditions, because Jeronimo did not show a nexus between the harm she suffered and her membership in a particular social group; therefore, the burden never shifted to DHS to show by a preponderance of the evidence there was a fundamental change in country conditions or Jeronimo could not avoid persecution by relocating within Guatemala.

**PETITION DENIED.**