[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12462

_____

Agency No. A071-704-330

HASSAN FARAH,

                                                      Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                      Respondent.

_____

Petitions for Review of a Decision of the
Board of Immigration Appeals

_____

No. 20-12941

_____

D.C. Docket No. 1:20-cv-22074-RNS

HASSAN MOHAMED FARAH,

                                                      Petitioner-Appellant,

versus

MICHAEL W. MEADE,
Field Office Director, Miami Field Office,
U.S. Immigration and Customs Enforcement, et al,

Respondents-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(September 8, 2021)

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, Circuit Judge, and SELF,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

Hassan Farah, a criminal alien facing deportation to Somalia, petitions for review of the order of the Board of Immigration Appeals confirming his removability and denying his applications for withholding of removal, protection under the Convention Against Torture, and a refugee inadmissibility waiver. He also appeals the denial of his petition for a writ of habeas corpus. We previously stayed Farah's order of removal. We now dismiss in part and deny in part his petition for review, and we dissolve the stay of removal. In the light of that

_____

[*] Honorable Tilman Eugene Self III, United States District Judge for the Middle District of Georgia, sitting by designation.

2

decision, we also conclude that his habeas petition is moot as to one issue and not ripe as to another. So we vacate and remand with instructions to dismiss his habeas petition.

## I. BACKGROUND

According to his account, Hassan Farah was born in Somalia as a member of the Darod tribe. In 1991, when he was a child, men from the Hawiye tribe executed his father, raped his sister, and burned his home. He and his surviving family members fled to Kenya.

In 1996, Farah entered the United States as a refugee. A few years later, he applied for adjustment of status, but the government denied his application because he failed to appear for fingerprinting.

Between 2003 and 2006, Farah was convicted of several crimes in Minnesota. Those crimes included fourth-degree assault and fleeing a police officer in a motor vehicle, for which he was sentenced to a year and a day of imprisonment. Not surprisingly, Farah's crimes came to the attention of federal immigration officials.

The United States started removal proceedings against Farah in late 2006. It charged him as an alien without a valid travel document who had been convicted of a crime involving moral turpitude. 8 U.S.C. § 1182(a)(2)(A)(i)(I), (a)(7)(A)(i)(I). Farah's notice to appear did not include a date or a time for his

3

removal hearing, but he received a follow-up notification with that information a week later. At his hearing, Farah conceded that he was removable and did not seek any form of relief, so the immigration judge ordered his removal. The government kept Farah in custody at a detention center but released him after six months pending his removal from the United States.

Following his release, Farah committed numerous other crimes under Minnesota law, including interfering with a 911 call, fifth-degree possession of a controlled substance, and second-degree assault. For the second-degree assault conviction, he was sentenced to 39 months of imprisonment. After his release from prison, federal officials took custody of him again.

In December 2017, federal officials tried to deport Farah and 91 other Somalis back to Somalia on a chartered flight, but the flight never reached its destination. Instead, it spent two days on the ground and in the air before returning to the United States. Farah alleges that he and the other detainees on the flight were physically abused and prevented from using the bathroom for many hours. Several passengers on this flight later brought a class-action suit against the government. *See Ibrahim v. Acosta*, No. 17-cv-24574, 2018 WL 582520 (S.D. Fla. Jan. 26, 2018).

In May 2018, Farah moved to reopen his removal proceedings because of changed country circumstances, and the immigration judge granted his motion.

Farah then moved to terminate the proceedings. He argued that his notice to appear was defective because it did not provide a date and time for his hearing and it erroneously charged him as an arriving alien instead of as a refugee. The immigration judge denied his motion.

The government then filed additional charges against Farah and replaced the allegations in the original charging document with a new list. It alleged that Farah had been convicted in Minnesota of fourth-degree assault, Minn. Stat. § 609.2231, subd. 1; interfering with a 911 call, *id.* § 609.78, subd. 2; second-degree assault involving domestic violence, *id.* § 609.222, subd. 1; and fifth-degree possession of a controlled substance, *id.* § 152.025, subd. 2(a)(1) (2010) (current version at Minn. Stat. § 152.025, subd. 2(1)). And it alleged that Farah received sentences of a year and a day of imprisonment for the fourth-degree assault conviction and 39 months of imprisonment for the second-degree assault conviction. It charged Farah as removable for having been convicted of two or more crimes involving moral turpitude not arising out of a single incident, 8 U.S.C. § 1227(a)(2)(A)(ii); an aggravated felony, *id.* § 1227(a)(2)(A)(iii); a controlled-substance offense, *id.* § 1227(a)(2)(B)(i); and a crime of domestic violence, *id.* § 1227(a)(2)(E)(i).

Farah moved to transfer his immigration proceedings from Minnesota to Florida, where he was being held in a detention center. The immigration judge granted his request. Farah then admitted to all the government's factual allegations

but contested the four charges. He also applied for asylum, withholding of removal, protection under the Convention Against Torture, and a refugee inadmissibility waiver.

The immigration judge conducted a hearing at which Farah and his wife testified. Farah explained that he was afraid to return to Somalia because he was an "Americanized" Somali. He said that two of his cousins who were deported to Somalia were killed because they spoke English instead of Somali. And he alleged that the Somali government would not protect him because it was secretly working with the Islamic militant group al-Shabaab. He also asserted that his wife worked two jobs to support their children, three of whom had serious medical problems. His wife confirmed the statements about her work schedule and their family.

The immigration judge credited the testimony of Farah and his wife but denied the applications for relief. First, the immigration judge found that Farah was ineligible for asylum because the second-degree assault conviction was an aggravated felony. *See* 8 U.S.C. § 1158(b)(2)(A)(ii), (b)(2)(B)(i). He then found that Farah was still statutorily eligible for withholding of removal and for protection under the Convention Against Torture because the assault convictions were not "particularly serious crime[s]." But the immigration judge nevertheless denied the application for withholding of removal because Farah failed to establish that he had suffered any past harm rising to the level of persecution, he failed to

6

demonstrate a likelihood of future persecution, and he failed to establish a nexus between the anticipated persecution and the proffered grounds of being an "Americanized" Somali and a moderate Muslim. The immigration judge also denied the application for protection under the Convention Against Torture because Farah failed to establish that he would likely be tortured by or at the instigation or acquiescence of a public official acting in an official capacity. Next, the immigration judge determined that he lacked jurisdiction to adjudicate Farah's refugee inadmissibility waiver. In the alternative, he considered the merits of Farah's application and decided that he would not grant the inadmissibility waiver even if he had jurisdiction.

In May 2019, the Board of Immigration Appeals affirmed the immigration judge's decision and dismissed Farah's appeal. First, the Board rejected Farah's argument that the immigration judge lacked jurisdiction over the removal proceedings because of the defective notice to appear. Second, it concluded that Farah was removable for his controlled-substance conviction. It explained that although the Minnesota controlled-substances statute under which Farah was convicted was broader than the federal statute, the Minnesota statute was divisible because the identity of the controlled substance is an element of the offense. And it asserted that Farah's conviction record "clearly reflects that he was convicted of possessing marijuana, which is a federally controlled substance." Third, it

concluded that Farah's conviction for second-degree assault was a crime of violence, which made him removable as an aggravated felon. Fourth, the Board decided that even if it had jurisdiction to adjudicate Farah's inadmissibility waiver, it would decline to grant the waiver. Without deciding whether Farah was a violent or dangerous individual, it determined that Farah and his family would suffer exceptional and extremely unusual hardship if he was deported. But based on Farah's many criminal convictions and long history of alcohol abuse and relapses, it nonetheless concluded that Farah did not merit a discretionary waiver. Finally, it concluded that the immigration judge's findings concerning the applications for withholding of removal and for protection under the Convention Against Torture were not clearly erroneous.

Farah petitioned for review of the Board's decision and moved for a stay of removal. We denied his first motion. But after he filed a second motion, a divided panel of this Court granted it and ordered the stay.

In May 2020, Farah petitioned for a writ of habeas corpus. 28 U.S.C. § 2241. He alleged that his prolonged detention without a hearing since late 2017 was unconstitutional. The district court denied the petition.

Relying on a footnote from our opinion in *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 n.4 (11th Cir. 2002), the district court concluded that Farah's ongoing detention was governed by a statute, 8 U.S.C. § 1231(a), that regulates the

8

detention of aliens subject to a final order of removal. Under Supreme Court precedent, detention under section 1231(a) is presumptively reasonable for six months, after which an alien may challenge his ongoing detention by showing that "there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas v. Davis*, 533 U.S. 678, 682, 701 (2001). But the district court concluded that Farah had "interrupted" his six-month clock by moving for and obtaining a stay of removal, so his continued detention did not violate due process.

Farah appealed the denial of his habeas petition. He argues that his detention is governed by a different statute, 8 U.S.C. § 1226(c), and he asks us to instruct the district court to consider his as-applied constitutional challenge. We consolidated Farah's habeas appeal with his immigration petition. After the government released Farah on his own recognizance to comply with a nationwide injunction concerning detainees at heightened risk from the COVID-19 virus, it moved to dismiss Farah's appeal as moot.

## II. STANDARDS OF REVIEW

We review the decision of the Board and the decision of the immigration judge to the extent that the Board expressly adopted the immigration judge's opinion. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010). We review legal questions *de novo* and administrative findings of fact for substantial evidence. *Id.* at 948. We review our subject-matter jurisdiction *de novo*. *Indrawati*

9

*v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015). Finally, we review the denial of a habeas petition *de novo*. *Singh v. U.S. Att'y Gen.*, 945 F.3d 1310, 1313 (11th Cir. 2019).

### III. DISCUSSION

We begin with Farah's petition for review of the Board's decision. Farah contends that he is entitled to a remand because of his defective notice to appear; that his controlled-substance conviction is not a removable offense; that his second-degree assault conviction is also not a removable offense; that the Board erred in denying his inadmissibility waiver; and that the Board erred in denying his applications for withholding of removal and for protection under the Convention Against Torture. We address each argument in turn and explain why each fails. We then turn to Farah's appeal from the denial of his habeas petition and explain why that petition should be dismissed.

### A. Farah Failed to Preserve Whether His Defective Notice to Appear Violated the Agency's Claim-Processing Rules.

Farah argued in his appeal to the Board that the immigration judge lacked jurisdiction over his removal proceedings because his notice to appear was defective. A notice to appear for formal removal proceedings must contain "[t]he time and place at which the proceedings will be held." 8 U.S.C. § 1229(a)(1)(G)(i). Any notice that does not contain this information is deficient. *Pereira v. Sessions*,

138 S. Ct. 2105, 2110 (2018). But we held in *Perez-Sanchez v. United States Attorney General* that the time-and-place requirement "sets forth only a claim-processing rule," not "a jurisdictional rule." 935 F.3d 1148, 1154–55 (11th Cir. 2019). So the immigration court retains jurisdiction over an alien's removal proceedings even if the alien's notice to appear does not contain the time or place of the proceedings. *Id.* at 1157.

Farah acknowledges that our opinion in *Perez-Sanchez* forecloses the jurisdictional argument that he made to the Board, and he argues instead that his defective notice to appear violated the agency's claim-processing rules. But whether Farah is entitled to a remand because his defective notice to appear violated the agency's claim-processing rules is a separate issue from whether the immigration court lacked jurisdiction over his removal proceedings. *See id.* And Farah failed to exhaust that claim-processing argument because he never raised it before the Board and the Board never considered it. Because we lack jurisdiction to review issues that were not raised before the Board, *see Indrawati*, 779 F.3d at 1297, we must dismiss Farah's petition as to this issue.

## B. Farah Is Removable for His Controlled-Substance Conviction.

The Immigration and Nationality Act provides that an alien may be deported if he is convicted of "a violation of . . . any law or regulation of a State, the United States, or a foreign country relating to a controlled substance," unless the sole

11

offense is possession of 30 grams or less of marijuana for personal use. 8 U.S.C. § 1227(a)(2)(B)(i). Farah was convicted under a Minnesota statute that makes it a crime to "possess[] one or more mixtures containing a controlled substance classified in [Minnesota] Schedule I, II, III, or IV, except a small amount of marijuana." Minn. Stat. § 152.025, subd. 2(a)(1) (2010) (current version at Minn. Stat. § 152.025, subd. 2(1)). The Board determined that Farah's conviction qualified as a removable offense under the Act. Farah challenges that decision in his petition for review.

To determine whether a state offense makes an individual eligible for removal, we apply either the categorical approach or the modified categorical approach, depending on whether the state statute is divisible—"that is, [whether] it lists a number of alternative elements that effectively create several different crimes." *Guillen v. U.S. Att'y Gen.*, 910 F.3d 1174, 1180 (11th Cir. 2018) (internal quotation marks omitted). If the state statute is not divisible, we apply the categorical approach and "consider only the fact of conviction and the statutory definition of the offense." *Id.* (internal quotation marks omitted). "We do not consider the facts of the case, and instead ask only whether the state statute defining the crime of conviction categorically fits within the generic federal definition of a corresponding [offense]." *Donawa v. U.S. Att'y Gen.*, 735 F.3d 1275, 1280 (11th Cir. 2013) (internal quotation marks omitted). If the state statute

12

is divisible, then we apply the modified categorical approach, under which we "expand our inquiry beyond the fact of conviction and also look to the record of conviction." *Id.* (internal quotation marks omitted).

Farah and the government agree that, under the categorical approach, subdivision 2(a)(1) of section 152.025 does not fit within the generic federal offense because the state schedules list controlled substances that are not included in the federal schedules. *Compare* 21 U.S.C. § 812, *with* Minn. Stat. § 152.02. They disagree about whether the Board erred in applying the modified categorical approach. So we must decide whether the state statute is divisible.

The Board did not err in concluding that subdivision 2(a)(1) of section 152.025 is divisible. We are persuaded by the reasoning of the Eighth Circuit in *Rendon v. Barr* that "the identity of the controlled substance is an element of the possession offense in the Minnesota statute." 952 F.3d 963, 968 (8th Cir. 2020). The statute makes it a crime to possess "*a* controlled substance" listed in the Minnesota schedules of controlled substances. Minn. Stat. § 152.025, subd. 2(a)(1) (2010) (emphasis added). "[T]he use of the singular shows that the statute authorizes separate prosecutions for trafficking each of the various controlled substances listed in the schedules," which is possible only if "the identity of a controlled substance is an element of the offense." *Martinez v. Sessions*, 893 F.3d 1067, 1071 (8th Cir. 2018).

13

This interpretation is supported by Minnesota caselaw. In *State v. Papadakis*, the Minnesota Court of Appeals affirmed a conviction of seven counts of fifth-degree drug possession where the defendant possessed many different controlled substances at the time of his arrest. 643 N.W.2d 349, 352–53, 357–58 (Minn. Ct. App. 2002). It explained that the possession of multiple controlled substances "at the same time and place, for personal use," is not "a single criminal act." *Id.* at 357–58. And in *State v. Vail*, the Minnesota Supreme Court asserted that "Minnesota law requires proof of the actual identity of the substance." 274 N.W.2d 127, 134 (Minn. 1979). Farah argues that this statement is dicta. But even if it is dicta, it provides us "with insight into [the Minnesota Supreme Court's] thinking." *Caradigm USA LLC v. PruittHealth, Inc.*, 964 F.3d 1259, 1283 (11th Cir. 2020) (alterations adopted) (internal quotations marks omitted). And dicta on a matter of state law from a state's highest court is undoubtedly entitled to our respect. *See* Bryan A. Garner et al., *The Law of Judicial Precedent* § 4, at 69 (2016) ("[N]ot all dicta are created equal.").

None of the opinions cited by Farah supports his contention that the identity of the controlled substance is not an element of subdivision 2(a)(1) of section 152.025. Contrary to Farah's argument, *State v. Heck* does not stand for a general principle that anything listed after the words "to wit" in a charging document is not an element of a crime, regardless of the criminal statute. 23 Minn. 549, 549–50

(1877). And *State v. King* involves an unrelated question of state constitutional law: whether the Minnesota legislature can, consistent with the Minnesota Constitution, delegate its power to schedule controlled substances. 257 N.W.2d 693, 697 (Minn. 1977). Finally, *State v. Ali* concerns a defendant's mens rea and does not change the requirement that the government must prove the identity of a controlled substance to obtain a conviction. 775 N.W.2d 914, 918–19 (Minn. Ct. App. 2009).

Applying the modified categorical approach to the divisible statute and expanding our inquiry to include Farah's conviction record, we conclude that substantial evidence supports the Board's determination that Farah was convicted of a removable offense. According to his criminal record, Farah's conviction under subdivision 2(a)(1) of section 152.025 was for possession of oxycodone hydrochloride. The Board erroneously stated in its decision that Farah was convicted of possessing marijuana. But that error is harmless because oxycodone hydrochloride is a federally controlled substance. *See* 21 C.F.R. § 1308.12(b)(1)(xiv), (b)(2); *Edelen v. Astrue*, 711 F. Supp. 2d 1330, 1336 n.8 (N.D. Fla. 2010). In his reply brief, Farah argues that we should grant his petition so that the Board can conduct an evidentiary hearing about his oxycodone hydrochloride conviction, but he forfeited this argument by failing to raise it in his

opening brief. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014).

The Board correctly determined that subdivision 2(a)(1) of section 152.025 is divisible, and substantial evidence supports its finding that Farah was convicted of possessing a controlled substance included in the federal schedule. So the Board did not err in determining that Farah is removable for having a controlled-substance conviction. 8 U.S.C. § 1227(a)(2)(B)(i). We deny the petition for review as to this issue.

## C. Alternatively, Farah Is Removable for His Second-Degree Assault Conviction.

The Immigration and Nationality Act provides that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii). One kind of "aggravated felony" is "a crime of violence . . . for which the term of imprisonment [is] at least one year." *Id.* § 1101(a)(43)(F). And a "crime of violence" is "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16(a).

Farah contends that the Board erred in finding him removable for an aggravated felony based upon his conviction for second-degree assault. Minn. Stat. § 609.222, subd. 1. It is undisputed that Farah was sentenced to at least a year of

16

imprisonment for his conviction under subdivision 1 of section 609.222. The question we must decide is whether subdivision 1 fits within the federal definition of a crime of violence under the categorical approach. *See Jaggernauth v. U.S. Att'y Gen.*, 432 F.3d 1346, 1353 (11th Cir. 2005).

Subdivision 1 of section 609.222 makes it a crime to "assault[] another with a dangerous weapon." Minn. Stat. § 609.222, subd. 1. "Assault" means either "an act done with intent to cause fear in another of immediate bodily harm or death" or "the intentional infliction of or attempt to inflict bodily harm upon another." *Id.* § 609.02, subd. 10. "Bodily harm" is "physical pain or injury, illness, or any impairment of physical condition." *Id.* § 609.02, subd. 7. And a "dangerous weapon" is "any firearm, whether loaded or unloaded," "any device designed as a weapon and capable of producing death or great bodily harm," "any combustible or flammable liquid or other device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm," or "any fire that is used to produce death or great bodily harm." *Id.* § 609.02, subd. 6.

The Board correctly determined that subdivision 1 of section 609.222 is a crime of violence. The statute requires the intentional or attempted infliction of bodily harm, or an act done with the intent to cause fear of immediate bodily harm or death. True, "bodily harm" could mean "illness" or "impairment of physical

condition," which do not necessarily require the use of physical force. *Id.* § 609.02, subd. 7. In *State v. Kelley*, for example, the Minnesota Court of Appeals held, in the context of a fourth-degree assault conviction, that spitting on or throwing feces at another person satisfied the "bodily harm" requirement. 734 N.W.2d 689, 693 (Minn. Ct. App. 2007). But unlike a fourth-degree assault conviction, a second-degree assault conviction also requires the use of a dangerous weapon, such as a firearm. And an act committed with a dangerous weapon that either physically harms someone or intentionally puts him in immediate fear of bodily harm or death inherently requires the use, attempted use, or threatened use of physical force.

Our interpretation is supported by the decision of the Eighth Circuit in *United States v. Lindsey*, which held that section 609.222 "requires the use, attempted use, or threatened use of physical force against another." 827 F.3d 733, 740 (8th Cir. 2016). To be sure, the issue in *Lindsey* was whether section 609.222 was a violent felony for purposes of the Armed Career Criminal Act, not whether it was a crime of violence under the Immigration and Nationality Act. *Id.* But the definition of a violent felony under the Armed Career Criminal Act is "virtually identical" to the definition of a crime of violence under the Immigration and Nationality Act. *Lukaj v. U.S. Att'y Gen.*, 953 F.3d 1305, 1312 (11th Cir. 2020).

Even if Farah were not removable for his controlled-substance conviction, he would be removable for his second-degree assault conviction. The Board did

not err in finding that Farah's conviction under subdivision 1 of section 609.222 was for an aggravated felony. *See* 8 U.S.C. § 1227(a)(2)(A)(iii). We deny Farah's petition for review as to this issue.

### D. The Board Denied the Refugee Inadmissibility Waiver Under the Correct Legal Standard.

The Attorney General and the Secretary of Homeland Security have the discretion to waive a refugee's inadmissibility "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." *Id.* § 1159(c). We generally lack jurisdiction to review discretionary decisions of the Attorney General, including denials of inadmissibility waivers. *Id.* § 1252(a)(2)(B)(ii). We retain jurisdiction over constitutional claims and questions of law. *Id.* § 1252(a)(2)(D). And whether the Board applied the correct legal standard is a question of law. *Frech v. U.S. Att'y Gen.*, 491 F.3d 1277, 1281 (11th Cir. 2007). But a petitioner may not disguise a "garden-variety abuse of discretion argument"—for example, that an immigration judge failed to properly weigh certain facts—as a question of law. *Alvarez Acosta v. U.S. Att'y Gen.*, 524 F.3d 1191, 1196–97 (11th Cir. 2008). Otherwise, the jurisdictional bar in section 1252(a)(2) "would be meaningless." *Id.* at 1197.

Farah argues that the Board misapplied the legal guidelines for evaluating refugee inadmissibility waivers that the Attorney General established in *In re Jean*,

19

23 I. & N. Dec. 373 (U.S. Att'y Gen. 2002). "[T]he first step is to determine if the refugee is a violent or dangerous individual." *Makir-Marwil v. U.S. Att'y Gen.*, 681 F.3d 1227, 1229 (11th Cir. 2012) (internal quotation marks omitted). At step two, "[i]f the refugee is not violent or dangerous, the general statutory standard for a [section 1159(c)] waiver applies, and the refugee must show that the waiver would serve humanitarian purposes, would assure family unity, or otherwise would be in the public interest." *Id.* (internal quotation marks omitted). But if the refugee is violent or dangerous, then he "must satisfy both the statutory standard and [a] heightened, extraordinary circumstances standard," specifically, "that national security or foreign policy considerations warrant the waiver or that denial of the waiver would result in exceptional and extremely unusual hardship to the refugee." *Id.* (internal quotation marks omitted). Finally, even if the refugee satisfies these standards, the Attorney General may still exercise his discretion to deny the waiver. *See In re C-A-S-D-*, 27 I. & N. Dec. 692, 699 (B.I.A. 2019).

The Board applied the *Jean* guidelines correctly even if it did not address every conceivable issue. It explained that it was unnecessary to decide whether Farah was a violent or dangerous individual because he had established "extraordinary circumstances" in that he and his family would "suffer exceptional and extremely unusual hardship" if he were deported to Somalia. In other words, it was unnecessary to decide step one of *Jean* because Farah satisfied both the

20

general and the heightened standards at step two. The Board ultimately denied Farah's inadmissibility waiver, despite the extraordinary circumstances, because of his long criminal history and chronic problems with alcohol. We find no legal error in the Board's analysis, so we deny Farah's petition as to this issue.

We also find no legal error in the Board's decision not to resolve the related jurisdictional question. The immigration judge concluded that he lacked jurisdiction to review the inadmissibility waiver and that, alternatively, the waiver should be denied. The Board declined to decide the jurisdictional question because it agreed that Farah did not deserve a discretionary waiver. Farah contends that skipping the jurisdictional issue was a legal error requiring reversal. It is odd that Farah would make this argument, as the Board's decision to consider the merits of his waiver request worked in his favor. Regardless, "[a]s a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach." *Immigr. & Naturalization Serv. v. Bagamasbad*, 429 U.S. 24, 25 (1976). Because the Board concluded that Farah did not merit an inadmissibility waiver, deciding the jurisdictional question would not have changed the outcome. The Board was not required to make an unnecessary determination.

Farah's remaining arguments are merely "garden-variety abuse of discretion argument[s]," not questions of law. *Alvarez Acosta*, 524 F.3d at 1196. He contends

21

that the Board "fail[ed] to engage in a balancing of all adverse and favorable factors" in its discretionary analysis. And he argues that the Board "failed to follow the legal rule . . . that the demonstration of exceptional and extremely unusual hardship must be employed as a significant favorable factor in the discretionary analysis." But disagreement with how the Board weighed a set of issues is not a legal argument. *Id.* So we must dismiss Farah's petition as to these issues.

### E.  The Board Did Not Err in Denying Farah's Applications for Withholding of Removal and for Protection Under the Convention Against Torture.

Farah challenges the Board's denial of his applications for withholding of removal under the Immigration and Nationality Act and for protection under the Convention Against Torture. To qualify for withholding of removal under the Act, an alien must show that, if returned to his country, his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). To qualify for protection under the Convention Against Torture, an alien must establish that he will more likely than not be tortured if removed to his country. 8 C.F.R. § 208.16(c)(2); *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004). Torture must be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1).

22

We begin by inquiring into our jurisdiction to review Farah's challenges to these decisions. We do not have jurisdiction to review factual challenges to a final removal order against an alien who is removable for having committed certain crimes, including aggravated felonies and controlled-substance offenses. *See* 8 U.S.C. § 1252(a)(2)(C). But we have jurisdiction to review factual challenges to an order denying protection under the Convention Against Torture to that same alien. *Nasrallah v. Barr*, 140 S. Ct. 1683, 1694 (2020). We also have jurisdiction to review all "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). Because Farah is removable for an aggravated felony and a controlled-substance offense, we cannot review any factual challenges to the denial of his application for withholding of removal. But we can review factual challenges to the denial of his application for protection under the Convention Against Torture. And we can review any questions of law that Farah raises about either decision.

Farah argues that the Board committed an error of law by failing to give reasoned consideration to his applications for withholding of removal and for protection under the Convention Against Torture. "To determine whether the Board gave reasoned consideration to a petition, we inquire only whether the Board considered the issues raised and announced its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Perez-Guerrero v. U.S. Att'y Gen.*, 717 F.3d 1224, 1232 (11th Cir. 2013)

(alterations adopted) (internal quotation marks omitted). "Although the Board must consider all of the relevant evidence, the Board need not address specifically each claim the petitioner made or each piece of evidence the petitioner presented." *Id.* (internal quotation marks omitted). The Board "does not give reasoned consideration to a claim when it misstates the contents of the record, fails to adequately explain its rejection of logical conclusions, or provides justifications for its decision which are unreasonable and which do not respond to any arguments in the record." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 803 (11th Cir. 2016).

We conclude that the Board gave reasoned consideration to Farah's applications for relief. It cited evidence from the record showing that Somalia is "a country experiencing a high level of violence, including killings and human rights abuses" by al-Shabaab. It also referred to evidence establishing that al-Shabaab does not control certain areas of the country. And it cited reports that the Somali government was fighting against al-Shabaab and other extremist groups. Based on that evidence, the Board found that Farah failed to establish that he would likely be targeted for persecution or that he could not relocate to a part of the country where he would not be persecuted. *See* 8 C.F.R. § 1208.16(b)(2). And it found that Farah had failed to establish that he would more likely than not be tortured "at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity" in Somalia. *Id.*

24

§ 1208.18(a)(1). In making these findings, the Board did not misstate the contents of the record, fail to adequately explain its conclusions, or provide justifications that were unreasonable or unresponsive to any arguments. *See Jeune*, 810 F.3d at 803.

Farah argues that the Board "ignored the mountain of evidence supporting [his] claims," including two sworn declarations by experts on Somalia. But the Board is not required to address specifically each piece of evidence that Farah presented. *Perez-Guerrero*, 717 F.3d at 1232. And "we lack jurisdiction to review petitions that contest the weight and significance given by the Board to various pieces of evidence." *Id.* (alteration adopted) (internal quotation marks omitted).

Farah contends that his petition is similar to the one we granted in *Gaksakuman v. United States Attorney General*, 767 F.3d 1164 (11th Cir. 2014). In *Gaksakuman*, an immigration judge concluded that the absence of evidence in State Department country reports rebutted an asylum-seeker's evidence that he would be persecuted or tortured upon his return to his home country. *Id.* at 1170. We held that the immigration judge applied flawed logic when he relied on silence in the State Department reports without discrediting the asylum-seeker's evidence or giving more weight to contrary evidence. *Id.* So we vacated the Board's order for failure to give reasoned consideration. *Id.* at 1171. Farah argues that the Board and the immigration judge who considered his application likewise relied on

25

silence in the record to conclude that "Americanized" Somalis are not subject to persecution. And he contends that they improperly relied on reports that the Somali government is fighting al-Shabaab to rebut his evidence that the government is secretly working with the militant group.

We are not persuaded by Farah's comparisons of his petition to *Gaksakuman*. The immigration judge did not rely on silence in country reports to rebut Farah's assertion that "Americanized" Somalis suffer persecution. Indeed, he agreed that the evidence established that Somali returnees suffer harassment and discrimination, but he found that the harm they suffered did not rise to the level of persecution. Farah's argument about whether the Somali government is fighting al-Shabaab also misunderstands our holding in *Gaksakuman*. The immigration judge and the Board relied on evidence in the record—not silence—to discredit Farah's assertion that the government is working with al-Shabaab. The flawed logic that we rejected in *Gaksakuman* is not present here.

The dissent contends that the Board failed to give reasoned consideration to Farah's application for withholding of removal because it "ignored highly relevant evidence" that westernized Somali returnees are persecuted and that al-Shabaab exercises influence throughout Somalia. Dissenting Op. at 48. Although we have repeatedly emphasized that "the Board does not need to discuss all record evidence" "to write a reviewable decision," we have acknowledged that, "[i]n

26

some cases, . . . it is practically impossible for the Board to write a reviewable decision without discussing 'highly relevant' evidence." *Ali v. U.S. Att'y Gen.*, 931 F.3d 1327, 1334 (11th Cir. 2019) (quoting *Min Yong Huang v. Holder*, 774 F.3d 1342, 1349 (11th Cir. 2014)). But we have so far provided little guidance about the kind of "highly relevant" evidence that the Board must acknowledge for its decision to be reviewable.

Highly relevant evidence is necessarily a subset of evidence. If it were otherwise, a reviewing court could abuse the reasoned-consideration requirement by characterizing any evidence not discussed by the Board as highly relevant. "To generate grounds for reviewability in this Court, the Board does not need to do much. We just need to be left with the conviction that the Board has heard and thought about the case and not merely reacted." *Id.* at 1333 (alteration adopted) (internal quotation marks omitted).

Our previous opinions offer some direction as to what evidence qualifies as highly relevant. In *Min Yong Huang v. Holder*, we held that the Board did not give reasoned consideration to an application for relief based on religious persecution because the Board discussed only the record evidence relating to "physical abuse" and failed to mention "the types of religious abuse" that are "highly relevant" to a claim of religious persecution, such as breaking up religious services, destroying churches, and confiscating religious materials. 774 F.3d at 1347–49. In other

words, the Board cited only evidence that was minimally probative to the application for relief and ignored evidence that was much more probative. And in *Ali v. United States Attorney General*, we held that the Board failed to give reasoned consideration to another application for relief based on religious persecution because it did not acknowledge numerous pieces of evidence that "seem[ed] to compel a contrary conclusion." 931 F.3d at 1334, 1337 (alteration adopted) (internal quotation marks omitted). We clarified that, on remand, the Board was free to "accord[] [this] highly relevant evidence less weight than other evidence," to "discredit[] [it] altogether," or to "explain why [it did] not meet the legal standard of religious persecution." *Id.* at 1336–37. But, as written, the failure to discuss the highly relevant evidence "l[ed] to illogical conclusions—ones that cast doubt on whether the Board considered that evidence in the first place." *Id.* at 1336.

If evidence is highly relevant, the Board must at least acknowledge that evidence, either implicitly or explicitly, in its decision. To be clear, the Board need not "write an exegesis" on the highly relevant evidence. *Min Yong Huang*, 774 F.3d at 1349 (internal quotation marks omitted). But its decision must leave us with the conviction that it "considered and reasoned through" the highly relevant evidence. *Ali*, 931 F.3d at 1331.

Applying this standard, none of the evidence cited by the dissent is highly relevant to Farah's application for relief. There is no logical contradiction between the finding that westernized Somali returnees are subject to harassment not rising to the level of persecution and the record evidence showing that al-Shabaab commits human rights abuses against its opponents. *See* Dissenting Op. at 48–50. The former is a description of how those returnees are treated by Somali society in general; the latter involves the activities of an armed guerrilla group operating in some but not all areas of Somalia. Nor is there a logical contradiction between the finding that Farah failed to show that he could not relocate to an area of Somalia not controlled by al-Shabaab and the record evidence of al-Shabaab's influence. *See id.* at 51–53. That an armed guerilla group exercises considerable influence does not mean that there is nowhere a returnee could safely relocate, let alone that the returnee met his burden of showing in an administrative hearing that internal relocation would be unreasonable.

Farah argues that the Board committed another error of law in finding that he suffered no past persecution, but any such error is irrelevant to his petition. The Board determined that the execution of Farah's father, the rape of his sister, and the burning of his home by a rival tribe did not amount to persecution of Farah because those actions were not directed against him personally. That determination might have been erroneous because "threats or harm to a person other than the

alien may constitute evidence that the alien suffered past persecution where that act *concomitantly threatens* the petitioner." *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1308 (11th Cir. 2013) (emphasis added) (internal quotation marks omitted). But even if the Board misapplied the law by failing to find that Farah suffered past persecution, that past persecution would have been on the basis of Farah's tribal membership, not the grounds listed in his application for relief. So any finding of past persecution because of tribal membership would not help Farah satisfy his burden of establishing a likelihood of future persecution on the grounds that he alleged in his application for relief. *See* 8 C.F.R. § 1208.16(b)(1)(iii).

Farah's argument that the Board failed to apply the correct test for whether internal relocation in Somalia was reasonable is also unavailing. When the applicant does not establish past persecution, he "bear[s] the burden of establishing that it would not be reasonable for him . . . to relocate, unless the persecutor is a government or is government-sponsored." *Id.* § 1208.16(b)(3)(i). Moreover, when the persecutor is not a government or government-sponsored, regardless of whether the applicant established past persecution, we presume that internal relocation would be reasonable, unless the applicant establishes otherwise by a preponderance of the evidence. *Id.* § 1208.16(b)(3)(iii). Here, Farah did not establish past persecution on the basis of being an "Americanized Somali" and a moderate Muslim, and al-Shabaab is neither a government nor sponsored by a government.

30

So the Board correctly presumed that internal relocation in Somalia was reasonable, and Farah had the burden of proving otherwise, which he did not do.

Finally, to the extent that Farah challenges the Board's factual finding that he is not entitled to protection under the Convention Against Torture, we deny his petition because substantial evidence supports the Board's decision. Farah does not assert that he has ever been tortured in the past, nor does he allege that he is likely to be tortured in the future, by a Somali government official. He does allege that the Somali government is working with al-Shabaab, so he presumably fears being tortured by al-Shabaab "at the instigation of, or with the consent or acquiescence of," a government official. *Id.* § 1208.18(a)(1). But the record includes evidence that the Somali government is fighting al-Shabaab. So the Board was entitled to find that it is unlikely that a government official would instigate or acquiesce to Farah's torture by al-Shabaab.

We deny Farah's petition for review as to his challenge against the denial of withholding of removal and of protection under the Convention Against Torture. And, having reviewed Farah's petition for review and found no meritorious argument, we also dissolve the stay of his removal order. We now turn to his appeal from the denial of his habeas petition.

*F. Farah's Habeas Petition Is Moot as to Detention Under Section 1226(c), and It Is Not Ripe as to Detention Under Section 1231(a).*

Farah's petition for a writ of habeas corpus involves two separate provisions of the Immigration and Nationality Act. The first is section 1226(c), which provides that "[t]he Attorney General shall take into custody any alien who" is removable for having committed certain crimes, including an aggravated felony and a controlled-substance offense. 8 U.S.C. § 1226(c)(1). Detention under this provision is mandatory for any alien falling within its scope and "may end prior to the conclusion of removal proceedings only if the alien is released for witness-protection purposes." *Jennings v. Rodriguez*, 138 S. Ct. 830, 847 (2018) (internal quotation marks omitted); *see* 8 U.S.C. § 1226(c)(2). The second provision is section 1231(a), which governs the detention of aliens who have been ordered removed. 8 U.S.C. § 1231(a).

When an alien receives a removal order, the Attorney General has 90 days to remove him from the United States. *Id.* § 1231(a)(1)(A). This "removal period" begins on the latest of three dates: "[t]he date the order of removal becomes administratively final"; "[i]f the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order"; and "[i]f the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement." *Id.* § 1231(a)(1)(B). The

32

removal period is extended beyond 90 days if the alien fails to make good-faith efforts to obtain necessary travel documents or otherwise "acts to prevent [his] removal." *Id.* § 1231(a)(1)(C).

Subsection (a)(2) requires the Attorney General to detain an alien "[d]uring" his removal period. *Id.* § 1231(a)(2). And subsection (a)(6) provides that the Attorney General may detain a qualifying criminal alien "beyond" his removal period. *Id.* § 1231(a)(6). Although subsection (a)(6) does not contain an explicit time limit on detention, the Supreme Court recognized in *Zadvydas v. Davis* that the Attorney General may not detain an alien under section 1231(a) beyond his removal period "once removal is no longer reasonably foreseeable." 533 U.S. at 699. The Court held that six months is a presumptively constitutional period of detention, after which the alien can challenge his ongoing detention on the ground that "there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701.

The district court reviewing Farah's habeas petition concluded that his ongoing detention was governed by section 1231(a). Farah's removal order became administratively final when the Board dismissed his appeal in May 2019, and his removal period began at that time. 8 U.S.C. § 1231(a)(1)(B)(i). His detention was then governed by section 1231(a) because it was "[d]uring [his] removal period." *Id.* § 1231(a)(2). Several months later, Farah moved for and obtained a stay of

removal from our Court. The district court determined that even after the stay, Farah's detention was still governed by section 1231(a). It relied on a footnote from our opinion in *Akinwale v. Ashcroft*, where we said that an alien who moved for and obtained a stay of removal "act[ed] to prevent [his] removal" under section 1231(a)(1)(C) and "interrupted the running of time under *Zadvydas*." 287 F.3d at 1052 n.4 (internal quotation marks omitted).

The text of section 1231(a) does not support the interpretation of the statute by the district court. "The removal period begins on the latest of" three possible dates, the second of which is the date of a reviewing court's final order "[i]f the removal order is judicially reviewed and if a court orders a stay of the removal of the alien." 8 U.S.C. § 1231(a)(1)(B)(ii). Farah's removal order is subject to judicial review, and we ordered a stay of his removal. But we have not yet issued our final order. So under the plain terms of the statute, Farah's removal period has not yet begun. And because section 1231(a) authorizes the government to detain an alien "[d]uring" and "beyond" but not before the removal period, Farah's ongoing detention cannot be governed by section 1231(a). *Id.* § 1231(a)(2), (a)(6). To be sure, Farah's detention *was* governed by section 1231(a) for the brief period between when the Board issued its decision and when we stayed Farah's removal. But once we ordered the stay, the removal period reset, and it will not begin again until we issue our final order with respect to his immigration petition.

34

We hold that section 1231(a) does not govern the detention of an alien whose removal has been stayed pending a final order from the reviewing court. In so holding, we join several of our sister circuits that have considered this issue. *See Hechavarria v. Sessions*, 891 F.3d 49, 56 (2d Cir. 2018); *Leslie v. Att'y Gen. of the United States*, 678 F.3d 265, 270 (3d Cir. 2012), *abrogated in part on other grounds by Jennings*, 138 S. Ct. 830; *Prieto-Romero v. Clark*, 534 F.3d 1053, 1061–62 (9th Cir. 2008); *Bejjani v. Immigr. & Naturalization Serv.*, 271 F.3d 670, 689 (6th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006). And our holding does not violate the prior-panel-precedent rule. In *Akinwale*, we affirmed the dismissal of a criminal alien's habeas petition because he had not been in custody for a prolonged period when he filed his petition and because he failed to show that his detention would be indefinite. 287 F.3d at 1051–52. In a footnote at the end of our opinion, we identified a third deficiency with his habeas petition: he made deportation impossible by moving for and obtaining a stay of removal. *Id.* at 1052 n.4. Farah argues that this footnote was dicta. But even if it was an alternative holding, it does not compel the conclusion that the government's detention authority continues to be governed by section 1231(a) after a reviewing court orders a stay of removal. We never addressed in *Akinwale* whether an alien continues to be detained "[d]uring the removal period" after the reviewing court orders a stay of removal.

35

Until we issue our final order as to his petition for review, Farah's detention is governed by section 1226(c). Because he is removable for committing an aggravated felony and a controlled-substance offense, his detention is mandated by the statute. 8 U.S.C. § 1226(c)(1); *Jennings*, 138 S. Ct. at 847. If we were deciding Farah's habeas appeal standing alone, we would vacate the denial of his petition and remand with instructions to consider his as-applied constitutional challenge to his detention under section 1226(c). But, as it happens, we have considered Farah's petition for review of the Board's decision, and we have concluded that he presents no meritorious argument.

In the light of our decision to dismiss in part and to deny in part Farah's petition for review and to dissolve the stay of removal, Farah's habeas petition is moot insofar as it challenges his detention under section 1226(c), and it is not ripe for review insofar as it challenges his detention under section 1231(a). Both Farah and the government agreed with this analysis at oral argument. As soon as we issue our final order resolving his immigration petition, Farah's removal period will commence, and his detention will be governed by section 1231(a). So he will no longer have a basis to challenge his detention under section 1226(c). If after six months he is still in custody and has not been removed from the United States, then he can challenge his detention under section 1231(a). But until then, his detention is presumptively reasonable under *Zadvydas*. We vacate and remand with

36

instructions to dismiss Farah's habeas petition as moot in part and not ripe for review in part. We also deny as moot the motion to dismiss Farah's appeal.

## IV. CONCLUSION

We **DISMISS IN PART** and **DENY IN PART** the petition for review. We also **DISSOLVE** the stay of removal. We **VACATE** and **REMAND** with instructions to dismiss Farah's habeas petition. And we **DENY** the government's motion to dismiss the appeal.

JILL PRYOR, Circuit Judge, concurring in part and dissenting in part:

I join the majority opinion except for part III.E, in which it holds that the Board of Immigration Appeals ("BIA") gave reasoned consideration to Hassan Farah's challenge to the denial of withholding of removal.   Although our standard of review is deferential, "we must be left with the conviction, based on the record before us, that the [BIA] has considered and reasoned through the most relevant evidence of the case." *Ali v. U.S. Att'y Gen.*, 931 F.3d 1327, 1331 (11th Cir. 2019).   When we are reviewing the denial of withholding of removal, this requirement means we must assure ourselves that the agency has adequately considered the evidence supporting a noncitizen's application for humanitarian protection before ordering him removed him to a country where he fears persecution.   In this case, I find that assurance lacking.   In my view, the BIA and the Immigration Judge, whose findings the BIA approved, mischaracterized the record and ignored "highly relevant" evidence in denying Farah's application for withholding of removal and thus failed to give his application reasoned consideration.  *Id.* at 1336 (internal quotation marks omitted).   I would grant Farah's petition for review on the denial of withholding of removal, vacate the BIA's decision, and remand for further proceedings.

38

## I.    BACKGROUND

### A. Farah's Application for Withholding of Removal

Farah applied for withholding of removal under 8 U.S.C. § 1231(b)(3), among other forms of relief, asserting that, if returned to Somalia, he feared persecution in the form of being "attacked, tortured[,] and killed" by the Somali terrorist organization al-Shabaab as an Americanized or westernized returnee to Somalia.  AR 658.[1]  Al-Shabaab, an established Islamist militant group affiliated with al-Qaeda, fights to overthrow the western-backed Federal Government of Somalia ("FGS") and turn Somalia into a fundamentalist Islamic state. Consequently, individuals in Somalia with known connections to the United States and the West are at risk of being persecuted by al-Shabaab.

In support of his application for withholding of removal, Farah submitted evidence including the declarations of two experts on conditions in Somalia, numerous news articles, and at least two country condition reports, all indicating that al-Shabaab (1) targets for violence westernized returnees and (2) wields control over large swaths of the country with impunity, making relocation to a safe area very difficult or impossible.  I discuss the record evidence on these two points in turn.

----

[1] "AR" refers to the administrative record.

First, Farah provided extensive evidence establishing al-Shabaab's practice of targeting for violence westernized returnees to Somalia. The evidence included the declaration of Christopher Anzalone, an expert on al-Shabaab and Islamic extremism, who stated that "[i]ndividuals with known connections to the United States are at heightened risk that [al-Shabaab] will view them as enemies of their cause and target them on this basis." AR 923. He noted that Somali returnees from the United States, among other western countries, are at risk because of suspicions—based on nothing more than their having spent time in the West—that they have been "cultivated by hostile intelligence agencies." AR 928. Anzalone's account was buttressed by the declaration of Mary Harper, a BBC journalist, author of multiple publications on Somalia and al-Shabaab, and research consultant on Somalia for the United Nations and United States Agency for International Development, among other organizations. In her declaration, she stated that al-Shabaab "suspects as possible spies anyone returning from the West, and executes those it finds guilty of spying." AR 951. And merely being suspected of spying equates to guilt: Harper explained that she spoke with a journalist in Mogadishu who said he receives "regular reports" of al-Shabaab "executing *suspected* spies in many different parts of Somalia," and that there is "no sign" the practice is diminishing as "[t]hese executions continue." AR 951–52 (emphasis added).

40

Bolstering Anzalone's and Harper's accounts, a newspaper article Farah submitted reported on an al-Shabaab execution in which the terrorist group killed five people, including a 16-year-old boy, accused of spying for United States, as well as Kenyan, and Somali, government forces. According to relatives of one of the victims, he was "innocent" of spying. AR 1161.

Two more newspaper articles profiled westernized returnees who feared execution at the hands of al-Shabaab because of the terrorist group's well-known practice of killing returnees from the West—either because they are suspected of being spies or because they are considered infidels. An Amnesty International Report noted that westernized returnees and those suspected of having links to foreign governments are at "increased risk of being unlawfully, killed, tortured[,] and otherwise ill-treated or threatened" by al-Shabaab. AR 1693. And a State Department Report observed that the terrorist group targets areas and commercial establishments "frequented by government officials, foreign nationals, merchants, and the Somali diaspora." AR 1237.

Second, Farah's evidence detailed al-Shabaab's insurgency against the FGS and the terrorist group's control over much of the territory in Somalia, which makes it difficult for al-Shabaab's targets to find a safe location. As the Trump Administration's 2018 extension of Temporary Protected Status for Somalia found, "Somalia's security situation remains fragile and volatile . . . . Al-Shabaab

41

continues to wage an armed insurgency against the [FGS]. The group has reasserted its territorial reach across substantial territory in southern Somalia from which it continues to launch coordinated mass attacks on Somali and [the African Union Mission in Somalia] military bases." AR 550 (citing Extension of the Designation of Somalia for TPS ("TPS Extension"), 83 Fed. Reg. 43695, 43696 (Aug. 27, 2018)). The TPS Extension concluded that because of the ongoing armed conflict, "requiring the return of Somali nationals . . . to Somalia would pose a serious threat to their personal safety." *Id.* (citing TPS Extension).

The evidence further indicated that the FGS's attempts to curb al-Shabaab's control have been unsuccessful. In a Presidential Proclamation, then-President Trump declared that "Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory. . . [and does not] provide the governance needed to limit terrorists' freedom of movement, access to resources, and capacity to operate." AR 923 (quoting Presidential Proclamation Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats ("Presidential Proclamation"), 82 Fed. Reg. 45161, 45167 (Sept. 27, 2017)). Anzalone's declaration similarly explained that the FGS was "incapable and unwilling" to protect people from al-Shabaab. AR 924. State Department reports and numerous news articles in the record confirmed that the FGS is unable to quash al-Shabaab—

42

either because al-Shabaab's control is too great or because it has infiltrated the Somali government.

## B.  The Decisions of the Immigration Judge and the BIA

The Immigration Judge denied Farah's application for withholding of removal.  First, the Immigration Judge ruled that Farah failed to establish that, upon removal to Somalia, it is more likely than not that his life or freedom would be threatened on account of a protected ground, stating in conclusory fashion that the "evidence of record shows that Somalian returnees are marginalized[] or discriminated against," but "harassment does not amount to persecution."  AR 124–25.  To support this conclusion, the Immigration Judge cited a 2017 State Department Human Rights Report noting that Somali returnees often suffer discrimination and a 2018 BBC article quoting a recent Americanized returnee who stated that there is "mistrust" for returnees because they are seen as "outsiders."  AR 618.  Second, the Immigration Judge ruled that Farah failed to carry his burden of establishing he could not relocate to other parts of Somalia "where the extremist groups he claims to fear have less control."  AR 125.  For support, the Immigration Judge cited only the 2017 Human Rights Report which mentions that there are some, unspecified, areas in Somalia outside of al-Shabaab's control.

On appeal, the BIA agreed with the Immigration Judge that Farah failed to establish a "likelihood of being persecuted if he is returned to Somalia . . . or that he could not relocate to an area of the country where he is not likely to be persecuted." AR 7 (citing AR 124–26). The BIA acknowledged that "voluminous evidence" indicates Somalia experiences "a high level of violence, including killings and human rights abuses by members of [a]l[-]Shabaab against those who oppose them or are perceived to oppose them." *Id.* However, the BIA failed to address the record evidence demonstrating that al-Shabaab targets westernized returnees, operates across the country with impunity, and has infiltrated the Somali government.

## II.    STANDARD OF REVIEW

We review only the BIA's decision, except to the extent that it expressly adopted the Immigration Judge's opinion. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010). Because the BIA expressly agreed with the Immigration Judge's findings that Farah failed to establish a well-founded fear of persecution and that he could not relocate within Somalia, we review both the Immigration Judge's and the BIA's decisions on withholding of removal. *See id.*

Whether the agency has afforded reasoned consideration is a question of law we review *de novo*. *Ali*, 931 F.3d at 1333. The Immigration Judge and the BIA "must consider all evidence introduced by the applicant." *Seck v. U.S. Att'y Gen.*,

44

663 F.3d 1356, 1364 (11th Cir. 2011) (internal quotation marks omitted); *see also* 8 C.F.R. § 1240.1(c) ("The immigration judge shall receive and consider material and relevant evidence . . . ."). Where the agency "has given reasoned consideration to the petition, and made adequate findings, we will not require that it address specifically each claim the petitioner made or each piece of evidence the petitioner presented." *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006) (internal quotation marks omitted). In determining whether the agency gave reasoned consideration, we must ensure that it "consider[ed] the issues raised and announce[d] its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted" to the issues raised and the evidence presented. *Id.* (internal quotation marks omitted). Some indications that the agency fails to give reasoned consideration include "when it misstates the contents of the record, fails to adequately explain its rejection of logical conclusions, or provides justifications for its decision which are unreasonable and which do not respond to any arguments in the record." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 803 (11th Cir. 2016).

## III.  DISCUSSION

To obtain withholding of removal, a noncitizen applicant must show that if returned to the proposed country of removal, his life or freedom would be threatened because of his race, religion, nationality, membership in a particular

social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). A noncitizen who has not shown past persecution on account of a protected ground may be entitled to withholding of removal "if he can demonstrate a future threat to his life or freedom on a protected ground in his country." *Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 437 (11th Cir. 2004) (internal quotation marks omitted). The Immigration Judge cannot require the applicant to provide evidence that he would be "singled out individually for persecution" if the applicant establishes "there is a pattern or practice of persecution" of those similarly situated to him, and his inclusion or identification with the group makes it "more likely than not" that his life or freedom would be threatened upon removal. 8 C.F.R. § 1208.16(b)(2).

An applicant cannot demonstrate entitlement to withholding of removal if he "could avoid a future threat to his . . . life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." *Id.* The regulation identifies several considerations relevant to the "[r]easonableness of internal relocation" determination, including: the totality of the relevant circumstances regarding an applicant's prospects for relocation, including the size of the country or last habitual residence; the geographic locus of the alleged persecution; the size, reach, or numerosity of the alleged persecutor; and the applicant's demonstrated ability to relocate to the United States in order to apply for withholding of removal. *Id.*

46

§ 1208.16(b)(3). In cases, like this one, where the persecutor is not the government or a government-sponsored actor, "there shall be a presumption that internal relocation would be reasonable unless the applicant establishes, by a preponderance of the evidence, that it would be unreasonable to relocate." *Id.* § 1208.16(b)(3)(iii).

Farah contends that the BIA and the Immigration Judge failed to give reasoned consideration to his application for withholding of removal, and so we cannot meaningfully review their decisions. Specifically, he argues that they ignored evidence in the record establishing: (1) a pattern and practice of persecution against similarly situated Somalis who returned from the United States or the West and (2) that al-Shabaab has "infiltrated many branches of the Somali government" and "control[s] the majority of the territory in Somalia," such that he could not reasonably relocate to avoid persecution. Petitioner's Br. at 45. The majority opinion rejects Farah's argument, concluding that the BIA gave his application reasoned consideration because it "cited evidence from the record showing that Somalia is 'a country experiencing a high level of violence, including killings and human rights abuses'" by the terrorist group al-Shabaab; the group "does not control certain areas of the country"; and the "Somali government was fighting against al-Shabaab." Maj. Op. at 24 (quoting AR 7). I agree with Farah. The BIA's recognition that Somalia experiences a high level of violence because

of al-Shabaab does not mean it grappled with Farah's evidence that he is likely to be a victim of that violence as a westernized returnee. And noting that al-Shabaab does not control some areas of the country and that the FGS is fighting the group do not show that the BIA considered Farah's evidence that the FGS is unable to control al-Shabaab and that the terrorist group's reach is nationwide. I would hold that the Immigration Judge and BIA failed to give reasoned consideration to Farah's application for withholding of removal because their decisions mischaracterized the record and ignored highly relevant evidence, rendering the decisions incapable of meaningful review. *See Jeune*, 810 F.3d at 803; *Ali*, 931 F.3d at 1334–35.

First, the Immigration Judge mischaracterized the evidence that westernized Somali returnees are harassed but not persecuted, ignoring considerable evidence of persecution. The Immigration Judge determined, "[t]he evidence of record shows that Somalian returnees are marginalized, or discriminated against . . . . However, harassment does not amount to persecution." AR 124–25. Although the evidence the Immigration Judge cited supported marginalization and discrimination that could be characterized as harassment, neither source indicated that westernized Somali returnees are *merely* harassed. No evidence in the record supported the Immigration Judge's determination; instead, voluminous evidence demonstrated the very opposite, that al-Shabaab does not merely harass but rather

48

targets with violence—including execution—westernized returnees because they are suspected of being informants or enemies of al-Shabaab's cause.  In making its finding that Farah had not shown a likelihood of persecution based on his status as a westernized Somali returnee, the Immigration Judge did not mention, much less engage with, two expert declarations, newspaper articles, and an Amnesty International report, all of which detailed al-Shabaab's practice of targeting and persecuting, not merely discriminating against or harassing, westernized returnees like Farah.

The BIA agreed with the Immigration Judge on this issue, stating in a single sentence that Farah had not shown he would likely be targeted for harm rising to the level of persecution.  The BIA deemed the Immigration Judge's finding—that westernized returnees suffer only discrimination and harassment—not clearly erroneous despite the BIA's own acknowledgment that "[t]he voluminous evidence regarding country conditions in Somalia shows a country experiencing a high level of violence, including killings and human rights abuses by members of [a]l[-]Shabaab against those who . . . are perceived to oppose them."  AR 7.  The BIA's acknowledgement that al-Shabaab targets with violence those who are perceived to oppose them—a group that includes westernized returnees—flatly contradicted the Immigration Judge's finding that westernized Somali returnees

49

suffer only discrimination and marginalization, not persecution.  Yet the BIA did not explain or even address this remarkable conflict.

The majority attempts to explain away the conflict by characterizing Farah's evidence as describing the "activities of an armed guerrilla group operating in some but not all areas of Somalia," which the majority says is distinct from how westernized returnees are "treated by Somali society in general."  Maj. Op. at 29.  But this is a distinction without a difference.  To be eligible for withholding of removal, a petitioner may establish that he would be persecuted by a group that the government is "unable or unwilling to control."  *Matter of W-G-R-*, 26 I. & N. Dec. 208, 224 n.8 (B.I.A. 2014).  Farah submitted evidence detailing the FGS's lack of control over its territory and inability to curb al-Shabaab's influence, which the Immigration Judge and the BIA failed to address.  Although there may be an explanation for this apparent contradiction between the Immigration Judge's finding that westernized returnees suffer only harassment and the evidence that they suffer persecution, it cannot be found in the Immigration Judge's and BIA's decisions.

The Immigration Judge's "failure to mention *any* . . . pieces of highly relevant evidence" contradicting the conclusion that westernized Somali returnees are merely harassed, not persecuted, "cast[s] doubt on whether the [Immigration Judge] considered th[is] evidence in the first place."  *Ali*, 931 F.3d at 1336 (internal

50

citation and quotation marks omitted).  By not even mentioning the highly relevant contrary evidence, the Immigration Judge "fail[ed] to adequately explain [his] rejection of [the] logical conclusion[]" that westernized returnees in Somalia are persecuted, not simply harassed.  *Id.* at 1334 (internal quotation marks omitted). And the BIA's failure to explain its determination that the Immigration Judge's finding here was not clearly erroneous despite acknowledging evidence directly contradicting the conclusion, "undermines [my] belief that [the BIA] has heard and thought [about the case] and not merely reacted."  *Id.* at 1336 (internal quotation marks omitted).  Thus, I believe the Immigration Judge's and BIA's decisions on this issue are "incapable of review due to a lack of reasoned consideration."  *Id.*

Second, the agency failed to afford reasoned consideration to highly relevant evidence when making its internal relocation determination.  The record contains extensive evidence detailing the FGS's lack of "command and control of its territory."  AR 923 (quoting Presidential Proclamation).  This source explains that the Somali government's lack of control means it is unable to "limit [al-Shabaab's] freedom of movement, access to resources, and capacity to operate."  *Id*.  The TPS Extension concludes that al-Shabaab's substantial influence across the country suggests "requiring the return of Somali nationals . . . to Somalia would pose a serious threat to their personal safety," AR 550 (citing TPS Extension).  The Immigration Judge did not acknowledge any of this evidence.  He determined, in

one sentence, that Farah failed to demonstrate that he could not relocate to other parts of Somalia where al-Shabaab has less control.  The BIA agreed with the Immigration Judge's finding that Farah failed to establish he could not relocate to an area of the country that is not controlled by al-Shabaab.  Here, again, the BIA did not discuss any evidence.[2]

It may be that the agency ultimately concludes Farah can reasonably relocate somewhere in Somalia.  But the Immigration Judge's and BIA's failure to address any of the "highly relevant evidence" I have discussed renders their internal relocation decision incapable of meaningful judicial review.  *Ali*, 931 F.3d at 1336 (internal quotation marks omitted).  There can be no doubt that the evidence of al-Shabaab's significant influence and control over substantial territory in Somalia and the FGS's inability to limit the terrorist group's reach is highly relevant.  Indeed, we have held that where the evidence of record indicates that a non-governmental group exercises significant influence throughout a country, the

---

[2] What is more, neither the Immigration Judge nor the BIA addressed whether Farah could reasonably relocate within Somalia to escape persecution.  True, Farah bore the burden of establishing that it would be unreasonable for him to relocate within Somalia.  *See* 8 C.F.R. § 1208.16(b)(3).  But even where a petitioner has this burden, we have emphasized the importance of the BIA "clearly evidenc[ing] its awareness of the[] [§ 1208.16(b)(3)] factors and of the requirement that relocation had to be reasonable." *Jeune*, 810 F.3d at 805 (explaining that, where the petitioner bore the burden to show that internal relocation would be unreasonable, the BIA's citation to our decision in *Arboleda v. U.S. Att'y Gen.*, 434 F.3d 1220 (11th Cir. 2006), was sufficient to establish that it had appropriately considered the reasonableness of petitioner's relocation).  The Immigration Judge's and BIA's decisions here contain no indication that either considered, or was even aware of, the § 1208.16(b)(3) factors or the requirement that internal relocation must be not only possible, but reasonable.

record "compels the conclusion . . . that [internal] relocation" is "not a viable option for the petitioners to escape persecution." *Arboleda v. U.S. Att'y Gen.*, 434 F.3d 1220, 1224–25 (11th Cir. 2006); *see also Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232 n.7 (11th Cir. 2005). And it is no answer that the Somali government is fighting against al-Shabaab when evidence in the record indicates the FGS's attempts to fight or limit al-Shabaab are ineffective. Evidence of a guerilla group's widespread influence or infiltration of government institutions suggests the government is unable or unwilling to control that group. *See, e.g.*, *Diaz de Gomez v. Wilkinson*, 987 F.3d 365, 365–66 (4th Cir. 2021); *see also Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1247 (11th Cir. 2006) ("The statutes governing asylum and withholding of removal protect not only against persecution by government forces, but also against persecution by non-governmental groups that the government cannot control."). It is true that the Immigration Judge and the BIA are not required to address each piece of evidence presented, *see* Maj. Op. at 25, but their respective "failure[s] to mention *any* . . . pieces of highly relevant evidence" establishing that al-Shabaab exercises control throughout Somalia "cast[s] doubt on whether the [agency] considered th[is] evidence in the first place." *Ali*, 931 F.3d at 1336 (internal citation and quotation marks omitted).

Our precedent demands that the Immigration Judge and BIA do more than simply cherry pick a few sentences or phrases from one or two sources and ignore

voluminous, highly relevant evidence supporting a petitioner's claim. *See id.* The stakes here—a person's life and freedom from the infliction of serious bodily injury—are too high. Of course, we cannot review the weight the Immigration Judge or BIA gives to any piece of evidence, *see Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), but "the evidence must be wrestled with," *Ali*, 931 F.3d at 1336; *see also Tan*, 446 F.3d at 1376 ("Although the Immigration Judge is not required to discuss every piece of evidence presented before him, [he] is required to consider all the evidence submitted by the applicant."). The Immigration Judge and BIA failed to confront and wrestle with Farah's evidence supporting withholding of removal from Somalia.

## IV.    CONCLUSION

Because the Immigration Judge's and BIA's decisions do not reflect reasoned consideration of the record evidence supporting Farah's withholding of removal claim and, as a result, the decisions are incapable of meaningful review, I would remand to the BIA for further consideration. *See Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 874 (11th Cir. 2018) ("Where the BIA has not given reasoned consideration or made adequate findings, we remand for further proceedings" (internal quotation marks omitted)). After a closer examination of the record, the agency may reach the same conclusions and deny Farah's request for relief. But I dissent because I cannot tell from the BIA's decision that it

54

considered and reasoned through the most relevant evidence or that it realized its acknowledgment about the risk of persecution was contrary to the Immigration Judge's finding on that issue.